**UNITED STATES of America,**
**Plaintiff-Appellee,**

v.

**Nirvana Ward ZUIDEVELD and Jack**
**Zuideveld, Defendants-Appellants.**

**Nos. 13771, 13772.**

United States Court of Appeals
Seventh Circuit.

May 1, 1963.

Rehearing Denied June 5, 1963,
en banc.

James P. Chapman, William J. Harte, Chicago, Ill., for appellant.

James P. O'Brien, U. S. Atty., S. John Templeton, Jr., Asst. U. S. Atty., Chicago, Ill., for appellee. John Peter Lulinski, John Powers Crowley, Asst. U. S. Attys., of counsel.

Before HASTINGS, Chief Judge, and CASTLE and SWYGERT, Circuit Judges.

HASTINGS, Chief Judge.

This is an appeal by Jack Zuideveld and Nirvana Zuideveld, his wife,[1] from a judgment of conviction for conspiracy to use the United States mails for the transmission of obscene materials in violation of Title 18 U.S.C.A. § 1461.[2]

In a single count indictment, appellants and thirty-seven other individuals were charged with the alleged conspiracy. Forty-two other individuals were named

---

1. Appellants were also known at times in their business activities as Jack and Nirvana Walters.

2. After declaring obscene matter nonmailable, § 1461 provides in part:

"Whoever knowingly uses the mails for the mailing * * * of anything declared by this section to be nonmailable * * * shall be fined not more than $5,-000 or imprisoned not more than five years, or both * * *."

as non-defendant coconspirators. The indictment sets out sixty-six overt acts charged to effect the objects of said conspiracy. The conspiracy was alleged to have commenced on or about March 1, 1959 and continued to about the date of the return of the indictment on January 16, 1961.

Of the original thirty-nine defendants, twenty-eight were convicted on pleas of guilty or *nolo contendere* before trial. One defendant died before trial.

The remaining ten defendants went to trial, and of these, two elected to be tried by a jury. The remaining eight defendants, including appellants, waived a jury trial and were tried by the court in a bench trial held simultaneously with the jury trial, the Honorable Richard B. Austin presiding.

The trial continued for one month. The two jury defendants were found guilty. Of the eight defendants tried by the court, one changed his plea to guilty early in the trial, two were found not guilty and the remaining five, including appellants, were found guilty.

Appellant Nirvana Zuideveld was sentenced to a term of one year and one day, of which all but thirty days to be served in a jail-type institution was suspended. She was placed on probation for a period of two years following service of the jail sentence.

Appellant Jack Zuideveld was sentenced to a term of one year and one day, of which all but five months to be served in a jail-type institution was suspended. He was placed on probation for a period of two years following service of the jail sentence.

Only the Zuidevelds have appealed their convictions. Their separate appeals were ordered consolidated and will be considered together in this opinion.

The basic errors relied on for reversal, and the contested issues arising therefrom, may be summarized as follows: (1) whether there was sufficient evidence to warrant the trial court's finding that the charged conspiracy and appellants' participation therein was proved beyond a reasonable doubt; (2) whether the evidence was sufficient to establish a single conspiracy as distinct from multiple separate conspiracies; (3) whether the trial court prejudicially erred in refusing to dismiss the indictment and suppress certain documentary evidence; (4) whether by this conviction appellants were prejudicially denied rights under the First Amendment to the Constitution of the United States; and (5) whether the trial court prejudicially abused its discretion in denying appellant's request to subpoena certain witnesses at government expense.

Appellants were married and resided in Oak Park, Illinois during the events concerned in this case. Jack had been a radio announcer and a writer. Nirvana had experience as a commercial artist.

In the spring of 1959, Jack was employed by Victory Printing and Publishing Company in Chicago, Illinois to edit its two publications, "Vim" and "Gym" magazines. In August, 1959, he obtained publishing rights to these magazines which he transferred to Nirvack Publishing Company, a corporation principally owned by his wife and one Chester Steel. Thereafter, Jack performed as editor of the magazines and assumed full responsibility for their content. They were sold on newsstands and sent through the mails.

Vim and Gym magazines were claimed by appellants to be designed to appeal to males interested in physical culture and sporting events. Some of the contents were not of a sexual nature. However, it is undisputed that much of the material therein, photographs and articles, carried a double entendre intent. Several articles dealt frankly with the subject of homosexuality. It must be admitted that the dominant theme of the magazines was to appeal to the interest of the homosexual male. Jack was the creator and author of some of the homosexual material printed in them. We shall not further describe their subject matter.

These magazines are protected in their homosexual content by the standards ap-

plied by the Supreme Court in Manual Enterprises v. Day, 370 U.S. 478, 82 S.Ct. 1432, 8 L.Ed.2d 639 (1962); One, Incorporated v. Olesen, 355 U.S. 371, 78 S.Ct. 364, 2 L.Ed.2d 352 (1958); and Roth v. United States, 354 U.S. 476, 77 S.Ct. 1304, 1 L.Ed.2d 1498 (1957). It is not contended here that the magazines were legally obscene and the issue of obscenity is not before us for decision. However, the magazines and their character are relevant to the scheme under scrutiny in this appeal.

While Jack was editing the magazines for Victory Printing in the spring of 1959, Nirvana was studying the file of correspondence from readers. She suggested to her husband that it would be a good idea to organize a correspondence club in order that readers of the magazines with similar interests could exchange information. This was mentioned to the publisher, who rejected the plan. However, he stated to appellants that if they desired to proceed with it they could have a page of advertising in the magazines if Nirvana would do the art work for the publications. Appellants accepted this proposal.

Thus was born the pen pal club to be known as "The Adonis Male Club." The club commenced operation through publication of advertisements in Vim and Gym in June, 1959 and in a number of subsequent issues. The Adonis Male Club was flourishing by late summer of 1959.

The format and content of the advertisement soliciting applications for membership in "a pen pal club for MALES ONLY" was obviously designed to attract the attention of homosexual males. It was prepared by Nirvana. The terms represented in substance that in exchange for a $5.00 membership fee, the applicant, upon being accepted for membership in The Adonis Male Club, would receive the name of a new male pen pal every month for a year. Such names would be "mailed in a plain envelope." The applicant was requested to choose the categories of correspondents from a list of sixteen printed as a part of the application blank. These ranged in variety from male models to truck drivers.

Through the proposed club membership, prospects were invited to "exchange body building photographs—relate interesting, personal experiences, get true enjoyment from swapping fascinating stories with males of unusual occupations and avocational pursuits."

A form of membership application was printed at the bottom of the advertisement. It was to be returned to International Body Culture Association, 546 N. Harvey, Oak Park, Illinois. There were blank spaces for the applicant to fill in his name, address, age, occupation, hobby, height, weight and measurements.

In developing the club, Nirvana assumed the legally registered names of "The Adonis Male Club" and "International Body Culture Association." All mailings from the club were signed by her as "Ed Nolan." She explained that she thought it would be inappropriate to use a woman's name in a male pen pal club. The business of the club and the magazines Vim and Gym (after they were taken over by appellants) were all carried on at appellants' residence in Oak Park.

The club received 650 membership applications. There is no showing that any were rejected. Correspondence was handled by Nirvana, assisted at times by Jack. She operated the club until November, 1959, when she became ill and then Jack began to help her. By the spring and summer of 1960, a substantial number of the members were renewing their memberships in the club.

Appellants published and sold a "membership only" year book containing descriptions and some pictures of club members. For a fee, members could obtain the name and address of a member described in the year book. The year book sold for $20.00 per copy.

She advertised in the March, 1960 issue of Gym that a sketch book showing "action sketches" would be offered for sale to members. She contemplated a

newsletter for club members. She considered organizing a summer camp for members to be operated by her husband. She received deposits for the summer camp from about 25 members. However, the plans for the sketch book, newsletter and summer camp were dropped. The reservation deposits were refunded.

Prior to September 16, 1960, the federal postal inspectors had been conducting an official investigation of persons suspected of receiving obscene materials through the mails. Certain of these persons admitted receiving such materials through membership in a pen pal club known as The Adonis Male Club of Oak Park, Illinois. One example was a postal employee in Chicago from whom postal inspectors recovered a large quantity of obscene correspondence in a homosexual vein.

Following such leads, on September 16, 1960, Nirvana was served with a subpoena duces tecum to produce all club records and correspondence before the federal grand jury in Chicago. She complied with the subpoena and produced the records. She then discontinued the operation of the club. She had obtained a gross revenue of about $4500 from the operation of the club.

During the course of the trial, the Government introduced in evidence a large number of letters written by about 45 club members to one another. In their brief on this appeal, appellants have characterized this material as follows: "While many of these letters were not obscene in themselves or contained much nonsexual material, *many of the letters contained language and pictures which can only be described as obscenity of a most vile and shocking character*." (Emphasis added.) The record bears out this frank and commendable concession by appellants. Thus, we are not required to pass on the issue of obscenity as it relates to the materials sent through the mails by the members of the pen pal club, organized, promoted and carried on by the appellants.

The Government also introduced in evidence the club records, applications for membership mailed in by members and correspondence with members. In addition, various issues of Vim and Gym magazines and the oral testimony of several witnesses were presented. It shall not be our purpose to detail the sordid unsavory picture revealed therein. We shall make reference only to some incidents that point the way in which our conclusions find support.

We look now to the record to determine whether there was sufficient evidence to sustain the finding of guilty by the trial court. It is appropriate to define our function in this respect as a reviewing court. In affirming an antitrust conspiracy in United States v. National City Lines, 7 Cir., 186 F.2d 562 (1951), cert. denied, 341 U.S. 916, 71 S.Ct. 735, 95 L.Ed. 1351, Judge Lindley stated: "It is their [defendants'] contention that the evidence fails to establish (1) that there was a conspiracy, (2) that the defendants or any of them acted with an unlawful specific intent, or (3) that they shared such intent in an illegal concerted undertaking, but that it discloses only activities lawful in all respects. The government, on the other hand, asserts that the evidence establishes the existence of all the elements essential to a finding of guilty and that, consequently the verdict may not be disturbed by this court on review. This difference presents the difficult crucial question of this appeal. Of course we are not trying this case *de novo*; nor are we called upon to decide whether as triers of the facts we would have found defendants guilty. Our only function is to determine whether the evidence was of such character as to require submission to the jury, or in other words, whether it was the duty of the trial court, as a matter of law, to direct a verdict of not guilty." 186 F.2d at 569.

It is not our function to weigh the evidence or determine the credibility of witnesses. The finding of guilty "must be sustained if there is substantial evidence, taking the view most favorable to the Government, to support it. * * * Participation in a criminal

conspiracy need not be proved by direct evidence; a common purpose and plan may be inferred from a 'development and a collocation of circumstances.'" Glasser v. United States, 315 U.S. 60, 80, 62 S.Ct. 457, 86 L.Ed. 680 (1942).

"No formal agreement is necessary to constitute an unlawful conspiracy. Often crimes are a matter of inference deduced from the acts of the person accused and done in pursuance of a criminal purpose. * * * The * * * conspiracy * * * may be found in a course of dealing or other circumstances as well as in an exchange of words. * * * Where the circumstances are such as to warrant a jury in finding that the conspirators had a unity of purpose or a common design and understanding, * * * the conclusion that a conspiracy is established is justified." American Tobacco Co. v. U. S., 328 U.S. 781, 809–810, 66 S.Ct. 1125, 90 L.Ed. 1575 (1946).

 While no formal agreement is necessary to constitute a conspiracy to commit a substantive offense under Title 18 U.S.C.A. § 371, yet the Government has the burden of proving what amounts to an agreement to do so. It is not necessary that there be any such agreement from the inception of the scheme. If there is such an agreement at any time, it is sufficient. Such an agreement may be inferred from the facts surrounding the commission of the substantive offense. Pereira v. United States, 347 U.S. 1, 12, 74 S.Ct. 358, 98 L.Ed. 435 (1954).

 There need not be proof that the conspirators were aware of the criminality of their objective, but knowledge of the commission of the substantive offense must be brought home to them to supply the essential ingredient of intent. Ingram v. United States, 360 U.S. 672, 678, 79 S.Ct. 1314, 3 L.Ed.2d 1503 (1959).

 Proof of the requisite knowledge and intent on the part of the conspirators need not be made by direct evidence. Indeed, it is a rare case in which such evidence may be found. The conspiracy may be shown by circumstantial evidence or permissible inferences or deductions from the facts. Such a showing is nonetheless substantial. Blumenthal v. United States, 332 U.S. 539, 549–550, 68 S.Ct. 248, 92 L.Ed. 154 (1947).

 The common design is the essence of the conspiracy. This may be shown by proof of concert of action in the commission of an unlawful act from which a plan, common design or an agreement can be inferred. United States v. Bucur, 7 Cir., 194 F.2d 297 (1952); United States v. Nelson, 7 Cir., 185 F.2d 758, 759 (1950); United States v. Gordon, 7 Cir., 138 F.2d 174, 176 (1943), cert. denied, 320 U.S. 798, 64 S.Ct. 266, 88 L.Ed. 481; United States v. Holt, 7 Cir., 108 F.2d 365 (1939), cert. denied, 309 U.S. 672, 60 S.Ct. 616, 84 L.Ed. 1018; Allen v. United States, 7 Cir., 4 F.2d 688 (1924), cert. denied, 267 U.S. 597, 598, 45 S.Ct. 352, 69 L.Ed. 806.

 Our review of the record in this case makes a number of things crystal clear. The widespread exchange of admittedly obscene materials through the mails was between defendant club member conspirators themselves and with others and it arose directly from their membership in The Adonis Male Club. The record is replete with direct evidence showing the wide extent of such correspondence and the admittedly vile nature of the obscenity. It was almost entirely of a male homosexual content and need not be repeated here. The conspiracy between the defendant club members was indisputably established by direct testimony and documentary evidence.

The basic defense of appellants at trial and on this appeal is "assuming that some members of the club conspired to mail obscenities there is no proof whatsoever that the Zuidevelds intended to participate in such a conspiracy or even had any knowledge of it." It is true there is no evidence showing that appellants sent or received obscene materials through the mails. However, there were a number of things shown to have occurred that, taken together and with the evidence as a whole, would have warranted the trial court's drawing the necessary inferences of knowledge and in-

tent to provide a substantial basis for finding them guilty.

We have in mind appellants' course of conduct in the publication of Vim and Gym magazines; their constant efforts to appeal to the interest of the homosexual male; their continued use of the double entendre in nude male art and writings; and their admitted knowledge they were reaching a homosexual male audience. Out of this course of conduct grew their idea of a pen pal club to appeal to such a group. They prepared the advertisement containing the subtle invitation to readers to exchange materials of common interest. They promoted the club and kept it running through the technique of mailing new names each month to the club member conspirators. The final established result was a membership of 650 and a confiscated mass of materials which they concede was the vilest sort of obscenity. They set up the cause with this resultant effect.

Did they have any reason to know what might and did happen? Did they lend any conscious encouragement and provide any assistance to this course of dealing? We need cite only a few instances from the record to indicate that they were not innocent promoters of the plan resulting in wholesale violations of the law.

A substantial number of applicants for club memberships, in filling out the line in the application form calling for "measurements," gave the dimensions of their genital organs in figures and descriptive matter. Nirvana read these and said she thought they were "smart aleck" or "nut" remarks and that she took no notice of them. Such applicants were admitted to club membership.

Letters written by club members to the club and received by appellants shed further light on this issue. We shall omit the actual name of each correspondent although it is shown in the record. Conspirator A wrote a letter to the club, together with his membership application, wherein he stated a definite interest in nude males and photographs thereof in other than a body building vein. A letter from Conspirator B to the club expressed his desire for someone to come and live with him who cares not for women. A letter from member C mailed to the club advising appellants that the original letters received from his first correspondents were from "hot uninhibited studs like myself" and requesting more of the same.

One of the common aspects of the correspondence between club members was exchanging photographs of males, frequently made by the use of a Polaroid camera. Many of these photographs were of individual members themselves in which they were shown in nude erotic poses, sometimes referred to in the record as homosexual action pictures. Self-photography evidently posed a problem for some members. Member D wrote the club for information regarding photographers. Jack replied in acknowledgment of the inquiry and told D he did not know any photographers to recommend. He continued in his letter to D by writing that he "would suggest that an answer to your problem would be to secure the loan (or rental) of a Polaroid camera with which you can take pictures of yourself without any difficulty. You develop the picture in one minute and if the exposure is not right, you can take the picture again with an adjustment of the lens setting that is very simple."

At the time the club was first under investigation by the postal inspectors, Jack protested his innocence by representing that members of the club and readers of the magazines were body builders and not homosexuals. It was established at the trial with positive evidence and at least one letter he wrote that he knew the opposite to be true. In the same investigation, Jack denied any responsibility for the article in Vim entitled "Tools for the Modern Male" and shifted the blame to another person. Yet, he later acknowledged the authorship of the article and assumed responsibility for the double entendre style. The trial court would have been warranted in disbelieving Jack's testimony.

Appellants conceived, organized and promoted The Adonis Male Club. A wholesale violation of 18 U.S.C.A. § 1461 was the result. To contend that appellants were so far removed from the course of conduct bridging the gap between the legal cause and the illegal effect, thereby remaining blissfully ignorant of and apart from the common design of the conspirators, is to ignore the obvious.

As the Supreme Court so well stated in American Tobacco Co. v. U. S., 328 U.S. 781, 809, 66 S.Ct. 1125, 90 L.Ed. 1575 (1946): "It is not the form of the combination or the particular means used but the result to be achieved that the statute condemns. It is not of importance whether the means used to accomplish the unlawful objective are in themselves lawful or unlawful. Acts done to give effect to the conspiracy may be in themselves wholly innocent acts. Yet, if they are part of the sum of the acts which are relied upon to effectuate the conspiracy which the statute forbids, they come within its prohibition."

Appellants in effect have asked us to try this issue *de novo*, arguing that "this case comes before the Court upon a virtual stipulation of *documentary facts* where, it is submitted, this Court is in as good a position as the trial judge to pass upon the legitimate inferences which should be drawn from this evidence." We reject this contention.

Appellants have posed the evidentiary review as raising as the basic contested issue: "Does the record of this case show that homosexuals have a greater propensity to write obscenity than 'normal' readers do?" We reject that question as the issue in this case.

Based upon our review of the record as a whole, and applying the standards heretofore set out, we hold that there is substantial evidence to support the judgment of the district court finding appellants guilty of the conspiracy charged. That is the issue for decision here.

Appellants assert that if there was sufficient evidence to establish a conspiracy, a total variance occurred "whereby the indictment alleged a single conspiracy but the Government at most proved multiple conspiracies between some club members." They rely on Kotteakos v. United States, 328 U.S. 750, 66 S.Ct. 1239, 90 L.Ed. 1557 (1946). The reliance on Kotteakos is misplaced. We believe there is no such variance here. This case comes within the ambit of Blumenthal v. United States, 332 U.S. 539, at 558–559, 68 S.Ct. 248, at 257, 92 L.Ed. 154 (1947) wherein Kotteakos is distinguished. See United States v. Agueci, 2 Cir., 310 F.2d 817, 829–30 (1962).

Appellants assert that the trial court erred in failing to suppress certain documents Nirvana tendered to the federal grand jury pursuant to subpoenas duces tecum and in failing to dismiss the indictment. We have carefully examined the record in this regard and find no error. Her appearance before the grand jury and the production of the *corporate records* in her custody was pursuant to due process of law. No fraud or deception was practiced on her. She was not a prospective defendant at that time. The Government did not learn until she was served that she was "Ed Nolan" and did not know of her personal connection with the matters under investigation by the grand jury. The trial court did not err in such rulings.

There is no merit in appellants' contention that their conviction violates their rights under the First Amendment. This argument is premised on the assumption that their conviction was based on the presumption "that homosexuals, when communicating with each other, will transmit obscenity." We have already rejected this premise. It was not the foundation of the convictions in this case.

Finally, appellants assert prejudicial error in the refusal of the trial court to subpoena other club members at government expense as witnesses for defendants. On the first day of trial, appellants moved the trial court to subpoena approximately *four hundred and twenty*

*witnesses* pursuant to Rule 17(b), Federal Rules of Criminal Procedure, 18 U.S.C.A.[3]

It was urged in support of the motion that these witnesses would testify they had not joined or used The Adonis Male Club for the purpose of mailing obscene matter. These witnesses were largely members of the club not named in the indictment. They were listed as coming from most of the states and some foreign countries, such as Mexico, Costa Rica, South Africa and Ethiopia.

██ ██ It is well settled that Rule 17(b), supra, does not vest an absolute right to the issuance of such subpoenas and that the trial court is granted a wide latitude in order to prevent abuses. We will not disturb the exercise of such discretion unless exceptional circumstances compel it. There was no such abuse of discretion here. Reistroffer v. United States, 8 Cir., 258 F.2d 379, 396 (1958), cert. denied, 358 U.S. 927, 79 S.Ct. 313, 3 L.Ed.2d 301.

The record shows that the able district judge who tried this case accorded defendants every consideration in the trial itself. This is revealed in the care used in his conduct of the simultaneous jury trial for two other defendants. He was not misled by the weight of the substantial evidence on the substantive violation of sending obscene materials through the mail.

We are completely satisfied, under the standards of review applicable here, that the record sustains the conviction of appellants and that the trial was free from prejudicial error. Substantial justice has been done.

The judgments appealed from are affirmed.[4]

Affirmed.

SWYGERT, Circuit Judge (dissenting).

I regret I cannot concur in the opinion of Chief Judge Hastings.

While it is conceded by everyone, including appellants, that the mails were used by some of the members of the Adonis Male Club in transmitting unquestionably obscene letters and photographs to each other, I do not believe the Government proved the Zuidevelds conspired to send this obscenity through the mails.

The Government concedes, as it must, that the magazines VIM and GYM did not come within the ban of nonmailable matter. This concession was unavoidable in light of the ruling in Manual Enterprises, Inc. v. Day, 370 U.S. 478, 82 S.Ct.

---

3. Rule 17(b) provides: "Indigent Defendants. The court or a judge thereof may order at any time that a subpoena be issued upon motion or request of an indigent defendant. The motion or request shall be supported by affidavit in which the defendant shall state the name and address of each witness and the testimony which he is expected by the defendant to give is subpoenaed, and shall show that the evidence of the witness is material to the defense, that the defendant cannot safely go to trial without the witness and that the defendant does not have sufficient means and is actually unable to pay the fees of the witness. If the court or judge orders the subpoena to be issued the costs incurred by the process and the fees of the witness so subpoenaed shall be paid in the same manner in which similar costs and fees are paid in case of a witness subpoenaed in behalf of the government."

With reference to the standing of appellants as "Indigent Defendants," see footnote 4, infra.

4. Upon proper showing, appellants were permitted to proceed on appeal *in forma pauperis*. They did not request appointment of appellate counsel. In the district court, they were permitted to proceed on trial as indigents and were represented by Mr. James P. Chapman, of the Chicago Bar, as court appointed counsel. Mr. Chapman, joined by Mr. William J. Harte, of the Chicago Bar, represented appellants on this appeal. On oral argument, they stated they had assumed this professional responsibility with the expectation of being paid by appellants for their services here. We commend Messrs. Chapman and Harte for their willingness to perform these services both on the trial and appellate level and for the dignity and restraint with which they handled an otherwise unwelcome task.

1432, 8 L.Ed. 639 (1962). It further admits that the advertisement therein of the Adonis Male Club, taken by itself or if found in some other magazine such as Life, Reader's Digest or Popular Mechanics, would be innocent. Accordingly, it is my view that the Government's evidence of a conspiracy hinges on an unwarranted inference that ought not be used to sustain its burden of proof beyond a reasonable doubt.

That inference or assumption of necessity is that any association of homosexuals wherein correspondence by mail is anticipated will result in the transmission of obscene materials. That this inference is unwarranted is amply demonstrated by the Government's admission that the creation of a "pen pal" club among homosexuals is not *per se* an infraction of the law. Perforce, it must make this admission because there is no law placing homosexuals in a legal status different from that of heterosexuals.

Furthermore, an assumption that homosexuals will inevitably indulge in obscenity if invited to correspond with one another through the aid of a "pen pal" club is no more valid than an assumption that one who establishes a so-called "lonely hearts" club among men and women thereby invites and promotes the transmission of obscenity through the mails. *Without indulging in this underlying assumption* there is, in my opinion, no substantial proof that the Zuidevelds conspired with 79 (out of a total of 650) members of the Adonis Male Club to exchange obscene materials.

The Supreme Court of the United States in Smith v. California, 361 U.S. 147, 80 S.Ct. 215, 4 L.Ed.2d 205 (1959), made it clear that scienter is a requisite of a violation of an obscenity statute.

To show that the Zuidevelds knew that the members of the Adonis Male Club would indulge in obscene correspondence and that they intended that obscene materials be transmitted through the mails, the majority cites the following specific evidentiary facts:

(1) Jack Zuideveld's representation that the magazines VIM and GYM were directed toward body builders and not homosexuals when he was aware that a substantial part of the readership were homosexuals, and his denial of responsibility for the "Tools" article in one issue of Vim.

(2) Thirteen applications (out of 650) contained measurements which allegedly could only be the size of the applicant's genitalia.

(3) Three letters from members: (a) one indicating interest in nude males; (b) another indicating a desire to live with him "who cares not for women"; and (c) a third indicating that correspondents were "hot uninhibited studs like myself." One letter from Jack Zuideveld to a Club member suggesting use of a Polaroid camera.

These evidentiary facts primarily tend only to prove something of which the Zuidevelds were admittedly aware, viz., that the Adonis Club was composed largely of homosexuals. Except for the inference that homosexuals generally or inevitably exchange obscenity if invited to correspond with one another, this evidence fails to establish the requisite knowledge, i. e., scienter, that some of the Club members would engage or were engaging in criminal correspondence.

While this evidence may also tend to establish knowledge on the part of the Zuidevelds that some of the Club members had proclivities peculiar to homosexuals, it does not establish that the knowledge and intent of the Zuidevelds was a *sine qua non* to the incidental illegal use of the mails.

Additionally, the scanty evidence upon which the majority bases its inference of the Zuidevelds' knowledge and intent fails completely in demonstrating the nexus between the inferred knowledge and intent and the incidental illegal activity of certain Club members. Absent this, the independent, illegal motivations and actions of Club members over whom the Zuidevelds exercised no control can-

not coalesce into a criminal conspiracy with the Zuidevelds as unwitting participants.

Pertinent to the question whether these evidentiary specifics are sufficient to prove the requisite element of conspiratorial knowledge and intent is the following language in United States v. Crosby, 294 F.2d 928, 942 (2nd Cir. 1961), wherein seven individual defendants and one corporate defendant were prosecuted for conspiracy to defraud:

> The scanty extrinsic evidence produced by the governement against these defendants implies guilt only if we first assume guilty knowledge and purpose; when used to prove that basic element of the crime, it is neither substantial nor convincing.

Certainly this particular evidence, or for that matter, all of the evidence when considered together, fails to prove a concerted agreement, i. e., a conspiracy, among the 37 indicted Club members and the Zuidevelds to use the mails for the exchange of obscene materials.[1]

It is pertinent to ask: How might the Zuidevelds have protected themselves from being drawn into a criminal conspiracy by knowledge based on an unsupportable inference that homosexuals when communicating with each other will generally transmit obscene material, or by incidental knowledge, again only by inference, that certain Club members might be illegally using the mails? The only solution available to them, I submit, would have been dissolution of the Club. Such a solution renders nugatory the Constitutionally protected right of even homosexuals to associate through correspondence or otherwise. This right is limited to them, as to all others, only by a proscription against using the mails for the transmisison of obscene materials. Henceforth, in light of the con-

demning inferences of the majority opinion, no one will dare organize a correspondence club of homosexuals.

The Supreme Court in Smith v. California, 361 U.S. 147, 150, 80 S.Ct. 215, 4 L.Ed.2d 205 (1959), recognized that "legal devices and doctrines, in most applications consistent with the Constitution," may not "be applied in settings where they have the collateral effect of inhibiting the freedom of expression, by making the individual the more reluctant to exercise it." The proof of a conspiracy to violate 18 U.S.C. § 1461 by using an inference that homosexuals will inevitably or generally transmit obscene materials falls precisely within this category of "legal devices and doctrines" condemned by the Supreme Court. The instant decision does more than inhibit— it destroys the right of homosexuals to associate together in correspondence clubs.

Although the activities of the Zuidevelds and their choice of means of making a livelihood may be termed despicable by most people and may not meet the standards of a majority of the citizenry, this does not deprive the Zuidevelds of the protection of the Constitution. Even homosexuals and reprobates who prey upon their hapless condition are entitled to find refuge in its dictates. Freedom of association is one of them. Gibson v. Florida Legislative Investigating Comm., 372 U.S. 539, 83 S.Ct. 889, 9 L.Ed.2d 929 (1963). Freedom of expression is another. Smith v. California, supra.

There is no question that obscene writings and materials are not protected by these freedoms. On the other hand, they do protect conduct and activity which does not come within the forbidden area.

I believe not only that there is a total lack of evidence to support the finding that the Zuidevelds engaged in a con-

---

1. The correspondence was usually confined to letters exchanged by two members; occasionally three-member letter exchanges were made. There was no evidence of any round-robin correspondence among all of the members and the Adonis Club or any evidence that the Zuidevelds or the Adonis Club mailed obscene materials or forwarded any letters from one member to another.

spiracy to violate the federal obscenity statute, but also that their conviction violates rights guaranteed by the First Amendment. Therefore, I would reverse.