**Mike SMILOFF, Appellant,**

v.

**STATE of Alaska, Appellee.**

No. 859.

Supreme Court of Alaska.

April 19, 1968.

Brian J. Brundin, of Hughes, Thorsness & Lowe, Anchorage, for appellant.

Edmund W. Burke, Asst. Dist. Atty., and Robert N. Opland, Dist. Atty., Anchorage, for appellee.

Before NESBETT, C. J., DIMOND and RABINOWITZ, JJ.

## OPINION

RABINOWITZ, Justice.

Appellant questions the lower court's administration of Criminal Rule 17(b) which provides for the issuance, at state expense, of subpoenas in behalf of indigent defendants. We hold that the superior court's rejection of appellant's request for the issuance of subpoenas pursuant to Criminal Rule 17(b) was error. We further hold that the court's ruling affected appellant's substantial rights and, therefore, the judgment and commitment which was entered below should be set aside and a new trial held.

Appellant was tried in the lower court upon a three-count indictment in which he was charged with the separate crimes of assault with a dangerous weapon, assault with intent to rape, and attempted rape.[1] Some three weeks prior to trial, appellant's court-appointed counsel moved under Criminal Rule 17(b) that subpoenas be issued for the attendance of five witnesses, all of whom resided at Sand Point, Alaska, at the time of the motion.[2] Our Criminal Rule 17(b) provides in part that:

> The court or a judge thereof may order at any time that a subpoena be issued upon motion or request of an indigent defendant. The motion or request shall be supported by affidavit in which the defendant shall state the name and address of each witness and the testimony which he is expected by the defendant to give if subpoenaed, and shall show that the evidence of the witness is material to the defense, that the defendant cannot safely go to trial without the witness and that

the defendant does not have sufficient means and is actually unable to pay the fees of the witness.

The grounds stated in appellant's motion were "that defendant is indigent and that said witnesses are necessary to the defense * * *." In his affidavit in support of the motion, appellant asserted that the five potential witnesses would provide "testimony necessary to [his] defense," and that his indigency prevented him from paying "the travel expense, witness fees, or service fees to require and enable the listed witnesses to appear for the defense."[3]

Appellant's motion then came before the superior court. At the outset of the hearing the trial judge indicated to appellant's counsel that Criminal Rule 17(b) contemplated that counsel had "to give the nature of the testimony." The court then asked whether counsel was in a position to indicate what the witnesses "might testify to." After appellant's counsel had outlined the expected testimony of four of the five witnesses,[4] the trial judge suggested to the State's attorney that perhaps the matter could be put in writing and an agreement reached between counsel as to the witnesses' testimony. The district attorney then informed the court that if appellant's counsel would furnish him with a brief written statement as to the witnesses' expected testimony, his office would "see if we'll stipulate to it, or indicate that we feel they won't testify to that, and then leave the witnesses in question for you to decide." The court then inquired of appellant's counsel whether he would furnish such a written outline of the witnesses' anticipated testimony.[5] Appellant's

---

1. As to each count it was alleged that the offense was committed on November 5, 1966, at Sand Point, Alaska, and that the victim in each instance was Elizabeth Kalmakoff.

2. All pertinent proceedings prior to trial, and the trial itself, took place at Anchorage, Alaska. Sand Point, Alaska is located in the Shumagin Islands off the Alaska Peninsula (about 500 nautical air miles from Anchorage).

3. The five Sand Point residents listed were Johnny Peterson, George Osterback, Ralph Bjornstad (incorrectly spelled "Junestert" in some portions of the record), Agnes Mobeck, and Kenneth Rudolph.

4. As to the prospective witness Kenneth Rudolph, appellant's counsel stated that he had "forgotten at the moment what he will say."

5. Appellant's counsel answered, "Yes, Your Honor. It's a matter of approximately

counsel answered affirmatively and the court then stated that it would rule on the merits of appellant's motion after the written statement had been furnished and counsel had had the opportunity to explore the possibility of agreement along the lines suggested by the district attorney. Later that same day, appellant's counsel filed a memorandum containing a brief summary of the testimony of the persons sought to be subpoenaed.

The matter was then again argued and at the conclusion of this second hearing, the court denied appellant's request for subpoenas as to Peterson, Osterback, and Mobeck but offered appellant the choice of Bjornstad or Rudolph.[6] Counsel for appellant selected Bjornstad. At the conclusion of the trial which was held a short time thereafter, appellant was found guilty of the crime of assault with intent to rape and was sentenced to fifteen years' imprisonment.

Before discussing the merits of the trial court's rulings under Criminal Rule 17(b), we consider it appropriate to dispose of appellee's argument that "The court's ruling should * * * be tested only on the basis of the averments made by [appellant] in his sworn affidavit."[7] In light of the portions of the record we have set out heretofore, we find no merit in the state's position. At no time during the two hearings, which were held in regard to appellant's Criminal Rule 17(b) motion, did the prosecution object to counsel for appellant's oral or written statements as to what testimony the witnesses would give. Here the initial requests, both for oral and written statements from defense counsel, came from the court, and it is clearly demonstrated that the state acquiesced in the court's suggestion that these statements be furnished. In view of such circumstances we consider the state's argument unfortunate. Further, Criminal Rule 53 provides that any of our rules of criminal procedure may be relaxed or dispensed with by the trial court where it is apparent to the court that strict adherence thereto would result in injustice. In the case at bar we believe that the trial judge correctly dispensed with Criminal Rule 17(b)'s requirement that the showing in support of the motion must be made by affidavit. This ruling was particularly appropriate in the case at bar where it appears that appellant was illiterate and that linguistic and cultural barriers existed between appellant and his counsel.

This is the first occasion we have had to decide issues involving application of Criminal Rule 17(b). Until 1966 our rule and Fed.R.Crim.P. 17(b) were virtually identical.[8] Representative of the federal authorities decided under the original text of Rule 17(b), Fed.R.Crim.P., is the follow-

---

what I outlined to the Court already today.' * * * [W]e have already—I guess there's been a ruling that Mr. [Peterson] * * *." The record does show that earlier in the hearing, after counsel had outlined the testimony he anticipated Johnny Peterson would give, the trial judge ruled that he would not issue a subpoena for Peterson's attendance at the trial.

6. Subsequently, the court entered a formal order denying appellant's motion in regard to Osterback, Mobeck, Rudolph, and Peterson.

7. Appellee's argument here is that Criminal Rule 17(b) requires the defendant to support the motion by affidavit in which the expected testimony of the witness must be set forth.

8. Effective July 1, 1966, the federal rule was amended to read as follows:

*Defendants Unable to Pay.* The court shall order at any time that a subpoena be issued for service on a named witness upon an *ex parte* application of a defendant upon a satisfactory showing that the defendant is financially unable to pay the fees of the witness and that the presence of the witness is necessary to an adequate defense. If the court orders the subpoena to be issued the costs incurred by the process and the fees of the witness so subpoenaed shall be paid in the same manner in which similar costs and fees are paid in case of a witness subpoenaed in behalf of the government.

ing language from United States v. Zuideveld:[9]

> It is well settled that Rule 17(b) * * does not vest an absolute right to the issuance of such subpoenas and that the trial court is granted a wide latitude in order to prevent abuses. We will not disturb the exercise of such discretion unless exceptional circumstances compel it. There was no such abuse of discretion here. Reistroffer v. United States, 8 Cir., 258 F.2d 379, 396 (1958), cert. denied, 358 U.S. 927, 79 S.Ct. 313, 3 L.Ed.2d 301.[10]

▋ We adopt the federal rule and hold that the right to have a witness subpoenaed at state expense is not absolute. In administering Criminal Rule 17(b), the trial court is vested with discretion in order to prevent abuses. Our review of the record has left us with the firm conviction that the trial judge abused his discretion in the case at bar. Appellant's showing (which properly encompassed not only his affidavit but also the memorandum and oral statements of his counsel in support of the rule 17(b) motion) warranted issuance of the subpoenas. We believe it of significance that at the time the motions were made seeking issuance of the subpoenas appellant stood charged with three serious felony offenses, each of which carried potentially severe separate penalties. Also of importance is that appellant was brought to trial in a community some five hundred air miles from his home—the situs of the alleged crimes; that appellant was uneducated; and that linguistic and cultural differences were present between appellant and his attorney. Any judgment with respect to whether the showing made by appellant's counsel that a prospective witness' testimony was material to the defense should have taken into account the barriers to effective communication which here existed between appellant and his attorney. The degree of precision with which defense counsel was able to allege facts in support of his motion for rule 17(b) subpoenaes must necessarily have been affected by quality and clarity of the communications from client to attorney.

Of further importance is the circumstance that the original counts of the indictment focused on the crime of attempted rape. In crimes of this nature the prosecutrix's testimony is usually crucial. Measured against these basic circumstances, we believe that appellant's showing under Criminal Rule 17(b) warranted the issuance of subpoenas at government expense.

In his brief appellant argues that the trial judge applied "too rigid a standard" in ruling on his motion. Nowhere did the trial judge articulate precisely what criterion had been employed in deciding whether or not to allow the subpoenas. Although at one point during the hearings on the motion, it appears that the trial judge stated he would issue a subpoena only if the witness could show that he was with appellant during the entire time in question, and thus prove that appellant had not committed the crimes charged.[11] The foregoing indicates that the trial judge applied too rigid a standard in administering Criminal Rule 17(b) in view of the significant circumstances appearing in this record.[12]

---

9. 316 F.2d 873, 881 (7th Cir. 1963), cert. denied, 376 U.S. 916, 84 S.Ct. 671, 11 L. Ed.2d 612 (1964).

10. To the same effect, see United States v. Woodard, 376 F.2d 136, 143 (7th Cir. 1967); Thompson v. United States, 372 F.2d 826, 828 (5th Cir. 1967); Barnes v. United States, 374 F.2d 126, 128 (5th Cir. 1967); Murdock v. United States, 283 F.2d 585, 587 (10th Cir. 1960).

11. At one point in the hearings the court said in part, "[I]f you could show that some of these men claimed they were with him the entire time, the entire evening."

12. Later in the hearings the trial judge asked whether a person financially able would "spend this * * * ($2,000.00) of his own money to bring witnesses that * * * he doesn't know any more

As we have indicated previously, we believe that appellant's showing was sufficient as to prospective witnesses Mobeck, Peterson, and Osterback to justify the issuance of Criminal Rule 17(b) subpoenas.[13] As to George Osterback, it was expected that he would testify he was with appellant at a bar in Sand Point until just before the alleged crimes took place. Appellant's counsel further asserted that he believed that the state had a witness who would testify that he observed two men at the spot where the victim was lying on the ground, and "It was probable that Mr. Osterback is this mysterious person who ran."[14] From a reading of the record, it appears that the trial judge denied appellant's request as to Osterback because he would have had to advise the witness of his privilege against self-incrimination.[15] We are of the opinion that Osterback's possible eyewitness testimony was relevant, and that a subpoena should not have been denied on the speculative ground that the witness might have exercised his privilege against self-incrimination if called to testify.[16] We are also of the opinion that appellant's showing was sufficient in regard to prospective witness Agness Mobeck in that her testimony was relevant and material for purposes of impeachment of the prosecution's chief witness, Mrs. Kalmakoff.[17]

about than this?" The trial judge further stated, "I'm wondering if a rich man would throw away Two Thousand Dollars ($2,000.00) to bring in some prospective witnesses like this?" During argument the State's attorney estimated that an individual round-trip ticket from Sand Point to Anchorage was $300, and that including per diem allowances, the total cost for the five witnesses sought by appellant would amount to $2,000. As to the costs involved, counsel for appellant stated in part:

The fact that he's in Anchorage in trial is just, I think, a condition of our court system, that we don't have a set-up in Sand Point; it's a very small place. [S]o the—this cost is not so much as—a matter to do with * * * justice as it is a matter to do with the facts of life as to the geography of our State and the court system * * * that we can support. I believe that if this defendant were an Anchorage resident, and * * * these witnesses were readily available as if we were in Sand Point, that it would be quite difficult * * * to say that the defendant should always disclose what his witnesses will say as a matter of tactics.

13. The trial court's discretion in administering Crim.R. 17(b) can be upheld in regard to the denial as to witness Rudolph on the ground that his testimony was cumulative of Bjornstad's prospective testimony.

14. On this subject the memorandum furnished by appellant's counsel reads:

The defendant has reason to believe that—Mr. Osterback may have further testimony extremely relevant to the case. Defendant believes that the State has a witness, one Thomas Joseph Yates, who will testify he saw Mrs. Kalmakoff lying on the ground with two men, one of which ran whom he cannot identify and the second of which was the Defendant. It is probable that Mr. Osterback is this mysterious person who ran. Further, Mr. Osterback was carrying a hunting knife in his belt on the night of the alleged crime.

15. As to this prospective witness, the court stated:

[A]s to whether or not * * * Mr. Osterback may have been one of the men seen, I can't see it has any relevancy here at all so far as his testimony, because I'd have advised him of his right not to incriminate himself. For that reason, he will be denied.
Later the trial judge further stated:
[B]ut I'm ruling him out on the basis that what you're attempting to prove here—you're going to prove that he did it, and I think * * * if the Court warns of his rights, that he wouldn't testify, wouldn't be of any help to you. And I think I'd be obligated to warn him of his rights. For that reason I'm not allowing him.

16. As to the interesting question of whether any inference could be drawn by the jurors from Osterback's claim of the privilege at trial, see generally VIII J. Wigmore, Evidence § 2272(b), at 437 n. 9 (McNaughton rev. 1961).

17. We have previously mentioned the crucial role the prosecutrix's testimony normally plays in rape and related offenses. Mobeck's testimony was of importance

Regarding prospective witness Johnny Peterson, appellant contemplated that the witness would testify he was his roommate and would offer character testimony in appellant's behalf. It was further anticipated that the witness would impeach the credibility of Mrs. Kalmakoff who had testified at the preliminary hearing that she did not like appellant because he had raped her once before. As to this event, appellant anticipated that Peterson would testify that what occurred was an act of consensual intercourse.[18] We hold that appellant's showing was sufficient as to this witness on both grounds. In light of the nature of the crimes charged in the indictment, evidence as to appellant's character was undoubtedly relevant and material. Further, evidence of a prior act of consensual sexual intercourse between the prosecutrix and appellant was relevant and material in regard to the issue of appellant's intent concerning the charges of rape and assault to commit rape, and was also relevant and material regarding the issue of the prosecutrix's consent.[19]

We hold that the superior court's denial of subpoenas for the attendance of these witnesses deprived appellant of the opportunity adequately to defend against the serious crimes with which he was charged and was therefore prejudicial error.

The judgment and commitment entered below is set aside and the case remanded for a new trial.[20]

---

because of its possible value for impeachment of the prosecutrix.

Appellant's presentation in regard to this potential witness was as follows:

Agnes Mobeck, Sand Point, Alaska, will testify that she came into the bar earlier that evening with Mrs. Kalmakoff and that they were both later joined by Mr. Kalmakoff. She should also be able to testify as to what was said between Mr. Osterback and Mrs. Kalmakoff. Mrs. Kalmakoff testified at the preliminary hearing that she was not in the company of any other person in the bar other than her husband and Mr. Osterback.

18. In denying appellant's request as to Peterson, the trial judge stated:

I'm not going to let him come here for the purpose of testifying that * * * an earlier act of rape never occurred, and I'm going to enter an order now directing the District Attorney to tell her not to testify in regard to any previous * * * rape that did or did not occur * * *.

19. 1 J. Wigmore, Evidence § 200 (3d ed. 1940).

20. The disposition we have reached has made unnecessary the resolution of the constitutional objections appellant has raised as to the application of Crim.R. 17(b) in this case. The gist of appellant's constitutional argument is that application of the rule here denied him equal protection, resulted in a denial of due process, and loss of his privilege against self-incrimination.

In regard to this contention, see the text of Rule 17(b), Fed.R.Crim.P., as amended in 1966. In the notes of the Advisory Committee to this amendment at 8 J. Moore, Federal Practice ¶ 17.01[3] (2d ed.1967), it is stated:

Criticism has been directed at the requirement that an indigent defendant disclose in advance the theory of his defense in order to obtain the issuance of a subpoena at government expense while the government and defendants able to pay may have subpoenas issued in blank without any disclosure. See Report of the Attorney General's Committee on Poverty and the Administration of Criminal Justice (1963) p. 27. The Attorney General's Committee also urged that the standard of financial inability to pay be substituted for that of indigency. Id. at 40-41. In one case it was held that the affidavit filed by an indigent defendant under this subdivision could be used by the government at his trial for purposes of impeachment. Smith v. United States, [114 U.S.App.D.C. 140], 312 F.2d 867 (1962). There has also been doubt as to whether the defendant need make a showing beyond the face of his affidavit in order to secure issuance of a subpoena. Greenwell v. United States, [115 U.S.App.D.C. 44], 317 F.2d 108 (1963).

The amendment makes several changes. The references to a judge are deleted since applications should be made to the court. An ex parte application followed by a satisfactory showing is substituted for the requirement of a request or motion supported by affidavit. The court

NESBETT, Chief Justice (dissenting).
I dissent from the majority holding that denial of the subpoenas was an abuse of discretion which substantially prejudiced appellant's defense. In my opinion, a new trial is not warranted.

Subpoenas for five witnesses were requested by court appointed counsel for appellant approximately three weeks before trial. The irregular piecemeal justification for their production was not completed until approximately one week before trial. The witnesses resided at or near the community of Sand Point, which is located on the Alaska Peninsula approximately 500 air miles from the place of trial in Anchorage. The estimated total cost to the state of producing each witness appears from the record to have been in the neighborhood of $400.00. After the somewhat confused showing of justification for the subpoenas described in the majority opinion had been completed, the court granted the request as to one of the witnesses and denied it as to four.

Counsel obviously had not had the opportunity to interview any of the requested witnesses, all of whom resided in an area remote to the place of trial and appellant's place of detention prior to trial. What we learn in hindsight from our experience in this case is that in similar circumstances it would be advisable for the court to suggest that counsel request funds for the purpose of visiting the community where the crime is alleged to have occurred to interview potential witnesses for the defense. The testimony that each witness would give could then be definitely determined. The affidavit of justification as to each requested witness would be affirmative and accurate. This would permit the court to intelligently weigh the justification against the requirements of Criminal Rule 17(b) and act with assurance. It was twice suggested by the district attorney during one of the hearings that counsel for appellant go to Sand Point for the above purpose, but the suggestions appear not to have been given serious consideration by the court or defense counsel.

The majority opinion holds that the trial judge abused his discretion in refusing to issue subpoenas for the witnesses George Osterback, Agnes Mobeck and Johnny Peterson. The opinion states in part:

> Nowhere did the trial judge articulate precisely what criterion had been employed in deciding whether or not to allow the subpoenas.

and then, in a footnote, proceeds to quote the judge where he inquires of counsel whether a person financially able would spend $2000 of his own money to bring in witnesses about whose testimony he knew so little.

The fact is that the trial judge was applying the criterion established by the Supreme Court of the United States in Griffin v. People of State of Illinois [1] where it was held that destitute defendants must be afforded as adequate appellate review as defendants with money to pay for such services. In order to equate appellant's right to subpoena the witnesses at state expense, according to the established standard, the judge was properly attempting to determine, with the assistance of counsel, whether a person with personal funds would be willing to spend them to bring witnesses such a distance at unusual expense, who could offer only the testimony represented in the justification.

In view of this, it is not consistent for the majority to state that this inquiry "indicates that the trial judge applied too rigid a standard in administering Criminal Rule 17(b)". The trial judge made other inquiries and observations which plainly indicates that he was attempting to

is required to order the issuance of a subpoena upon finding that the defendant is unable to pay the witness fee and that the presence of the witness is necessary to an adequate defense.

1. 351 U.S. 12, 19, 76 S.Ct. 585, 100 L.Ed. 891, 899 (1956).

apply the standard of Criminal Rule 17(b) which requires that the evidence the witness is expected to give be material to the defense. The expense involved in producing a witness is one factor to be considered by the trial judge. The high cost of producing requested witnesses, when considered in relation to the materiality of the testimony expected to be given, can force the conclusion that an attempt is being made to abuse the right.[2] The footnote citation seems to be an example of an obvious attempt to abuse this right. In between the obvious attempt to abuse the right and the meritorious request is the request based upon the sincere but imaginative justification of a hopeful defendant. In weighing the latter type request against the requirements of Criminal Rule 17(b) the trial judge is required to exercise a sound discretion in determining whether "the evidence of the witness is material to the defense" and whether "the defendant cannot safely go to trial without the witness". The rule does not give the defendant the right to subpoena witnesses at state expense in the mere hope that, when produced, they will be found to be able to supply evidence favorable to the defense.[3]

In Reistroffer v. United States[4] the defendant requested permission to subpoena at government expense a handwriting expert, stating that he fully expected the expert to testify that in his expert opinion the handwriting contained on the purchase orders introduced into evidence was not the handwriting of the defendant. The appellate court stated:

> It appeared to the trial court that since Norris chose not to take the witness stand and produce samples of his handwriting and in the court's long experience, experts on handwriting could not be expected to give an opinion without laboratory tests and sure bases for comparisons, *there was too much uncertainty to justify the expense of bringing the expert witness from St. Louis, where he lived, to the place of trial at Waterloo*. It is also pointed out for the government that proof that the particular signatures referred to were not in the handwriting of Norris even if established would not have constituted a complete defense to the charges and the evidence against Norris. (emphasis supplied)

It is well settled that Rule 17(b), Federal Rules of Criminal Procedure, * *, under which the motion for subpoena was made, does not accord the indigent defendant an absolute right to subpoena witnesses at government expense. There is and must be wide discretion invested in the District Court to prevent the abuses often attempted by defendants. This Court will not disturb the exercise of the discretion unless exceptional circumstances compel it. Gibson v. United States, United States, 8 Cir., 53 F.2d 721, 722. \*

The question to be decided with respect to the denial of each subpoena is whether the trial judge abused the discretion placed in him by Criminal Rule 17(b) which provides that the subpoena *may* be issued after a showing by affidavit of the testimony the witness is expected to give, coupled with a showing that the evidence is material to the defense and that the defendant cannot safely go to trial without the witness. This discretion was described by Mr. Justice Reed in Greenwell v. United States[5] as follows:

> This discretion, of course, is not absolute in the sense of "no review under any circumstances," but does leave a large degree of freedom of decision to the trial judge to determine the materiality of the evidence which the defend-

---

2. See United States v. Zuideveld, 316 F.2d 873, 880–881 (7th Cir. 1963), where subpoenas for 420 witnesses, all members of the Adonis Veil Club, residing in most of the states and many foreign countries, were requested.

3. See Note 5 infra.

4. 258 F.2d 379, 396 (8th Cir. 1958) (emphasis supplied).

5. 115 U.S.App.D.C. 44, 317 F.2d 108, 113 (1963) (dissenting opinion).

ant seeks and the likelihood that such evidence will be forthcoming. Neither Rule 15 nor Rule 17 authorizes a general inquiry at Government expense into the circumstances of the crime with which the defendant is charged upon mere hope that favorable evidence will be unearthed; they provide for financial aid only when the defendant asserts reasonable grounds to believe that a witness has pertinent testimony to offer or that other helpful evidence is obtainable.

Abuse of discretion has been defined as arbitrary action as contrasted with the exercise of conscientious judgment;[6] and as, "when the action of the trial judge is clearly contrary to reason and not justified by the evidence."[7]

With respect to the request that a subpoena issue for the production of George Osterback, appellant's memorandum stated:

1. George Osterback, Sand Point, Alaska, will testify he was with the defendant at the bar in Sand Point from early evening till just before the alleged crime occurred. Further he is expected to testify that he purchased a drink for Mrs. Kalmakoff, the alleged victim and should support that defendant had no contact with Mrs. Kalmakoff in the bar that evening prior to the alleged crime.

Even if it is assumed that Osterback would testify in all respects as indicated, it is apparent that the testimony would not be "material to the defense". The fact that Osterback may have been with the defendant at the bar prior to the time the alleged crime was committed and purchased a drink for the complainant, with nothing more to show how it would assist the defense, does not make a satisfactory showing of materiality.

The memorandum in support of the request for a subpoena for George Osterback, in a second paragraph, stated:

The defendant has reason to believe that Mr. Osterback may have further tes-

timony extremely relevant to the case. Defendant believes that the State has a witness, one Thomas Joseph Yates, who will testify he saw Mrs. Kalmakoff lying on the ground with two men, one of which ran whom he cannot identify and the second of which was the Defendant. It is probable that Mr. Osterback is this mysterious person who ran. Further, Mr. Osterback was carrying a hunting knife in his belt on the night of the alleged crime.

The trial judge denied the sufficiency of the above allegations as support for the issuance of a subpoena at state expense, stating that if the defendant intended to prove that Osterback committed the crime, then the court would be obligated to warn him of his right not to incriminate himself under the 5th amendment and that it would be unlikely that he would testify. The allegation that the defendant "has reason to believe" that Osterback might have "further testimony extremely relevant to the case" does not in any manner comply with Criminal Rule 17(b) which requires that the defendant shall state the testimony which the witness is expected to give and should then show that the evidence is material to the defense and that the defense cannot safely go to trial without it. No attempt was made to outline the "further testimony". Instead, the defendant speculated on what the state witness might testify to and then inferred that Osterback might be the mysterious person who fled the scene of the alleged crime. Defendant indicated that he would prove that Osterback committed the crime instead of the defendant by questioning Osterback as a witness. If there were facts which were expected to be brought out by Osterback's testimony that would prove that he committed the crime, the court should have been so advised. If there were facts which would point to Osterback as the "mysterious person who ran" from the scene of the al-

6. Burns v. United States, 287 U.S. 216, 223, 53 S.Ct. 154, 77 L.Ed. 266, 270 (1932).

7. Springfield Crusher, Inc. v. Transcontinental Ins. Co., 372 F.2d 125, 126 (3rd Cir. 1967).

leged crime, where appellant was also placed by Yates' testimony, then appellant should have so advised his counsel who could have so advised the court. Appellant did not use the witness Ralph Bjornstad who was subpoenaed at state expense. Appellant did not take the stand in his own defense. Yet this court has found that reversible error was committed in not producing Osterback on the vague and improbable representation that he might be questioned into admitting that he committed the crime instead of appellant.

Appellant's memorandum justified the request that Agnes Mobeck be subpoenaed by stating:

3. Agnes Mobeck, Sand Point, will testify that she came into the bar earlier that evening with Mrs. Kalmakoff and that they were both later joined by Mr. Kalmakoff. She should also be able to testify as to what was said between Mr. Osterback and Mrs. Kalmakoff. Mrs. Kalmakoff testified at the preliminary hearing that she was not in the company of any other person in the bar other than her husband and Mr. Osterback.

The court denied this request on the ground that it could not see that it made any difference to appellant's defense whether Mrs. Kalmakoff was in the bar earlier that evening with Agnes Mobeck or whether she was not. Appellant's memorandum in support of the request failed to point out to the court wherein the testimony of Agnes Mobeck would be material to the defense and why appellant could not safely go to trial without such testimony. The most that can be said for the expected testimony is that it might contradict complainant on an unimportant aspect of her testimony before the grand jury.

Appellant requested that Johnny Peterson be subpoenaed so that he could testify that an earlier rape, alleged to have been mentioned by the complainant to the grand jury, was not a rape, but a consensual act. The court denied the request and entered an order directing the district attorney to advise the complainant that no testimony would be admitted concerning any previous act of alleged rape since it was not an issue in the case.

The majority opinion holds that evidence of a prior act of consensual intercourse was relevant and material to the issue of appellant's intent and to the issue of prosecutrix's consent. Wigmore is cited as authority for this holding.[8] Wigmore personally believes, as does the majority of this court, that evidence of particular acts of a woman's unchastity should be admitted to show the likelihood of consent, but is careful to point out that no question of evidence has been more controverted and that such evidence is excluded in the greater number of jurisdictions.[9]

In my opinion, we should not proceed to commit this court on a question of law which has not been briefed as an issue, but that we should first determine whether the trial judge's denial of the subpoena was clearly contrary to reason, i. e. an abuse of discretion.

I think that it was not an abuse of discretion. The admissibility of such evidence had not been passed upon by this court. Most jurisdictions exclude it. Where such evidence is admissible it is generally on the ground that it is relevant to the question of consent. Appellant did not take the stand and made no attempt to state or establish the defense of consent. In view of this, appellant could not have been prejudiced by not having the benefit

---

8. 1 J. Wigmore, Evidence, § 200 (3rd ed. 1940).

9. See for example, State v. Severns, 13 Wash.2d 542, 125 P.2d 659, 664 (1942), where the court said:
Whatever the rule in this state may formerly have been in regard to the right of a defendant in forcible rape cases to show specific acts of misconduct on the part of the complaining witness, it is now firmly established that such acts are not admissible.
Contra, People v. Walker, 150 Cal.App. 2d 594, 310 P.2d 110, 114 (1957); State v. Wood, 59 Ariz. 48, 122 P.2d 416, 418, 140 A.L.R. 361 (1942).

of the testimony that it was thought Peterson would give. I do not believe that this court is justified, under the uncontradicted testimony, some of which is related in a following paragraph, in presuming that if the court had subpoenaed Peterson that appellant would then have taken the stand on a defense of consent and utilized Peterson's testimony to support his defense. When the trial judge entered an order that the matter of an alleged prior rape would not be testified to, the possibility that the trial of the main issue would be confused and clouded was eliminated, fully as much to the benefit of the appellant as to the state.

In my opinion the trial court did not abuse its discretion in denying the subpoenas for Osterback, Mobeck and Peterson.

We now know from the uncontradicted testimony of the complainant and the witnesses Lena Choquette and Thomas Yates that the complaining witness and her husband were physically assaulted and knocked to the ground by appellant as they walked home from the bar. While her husband sought assistance, the complainant resisted appellant who was struggling to remove her clothes. As the complainant's brother-in-law, Tom Yates, approached the scene in response to her husband's request for assistance, he heard complainant shouting for help. Upon his arrival at the scene he found complainant on the ground with a part of her clothing removed. Appellant was arising from the ground and zippering up his trousers. Complainant's testimony was that she had not been raped, but that appellant was attempting to do so. The witness Yates testified that on the Monday following the Saturday on which the rape was attempted he was berating appellant for his act when appellant admitted that "I might have done the other, but I did not cut her".

By the time the case was submitted to the jury two of the three indictment counts against appellant had been dismissed. Only the count charging assault with intent to commit rape remained.

On the uncontradicted testimony recited above the jury found appellant guilty. At the sentencing the district attorney advised the court that he had received more than one telephone call from Sand Point describing appellant as "the terror from Sand Point". The judge reviewed appellant's record of criminal violence dating back to 1948 and sentenced him to serve fifteen years in prison.

The majority believe that appellant was deprived of the opportunity to adequately defend against charges of serious crimes and should be given a new trial. At a retrial the only charge which appellant will be required to face will be the one remaining count of the indictment on which he has already been convicted, that of assault with intent to commit rape. The new trial has been granted on the theory that appellant would be enabled to place before the jury the testimony of the three witnesses for whom subpoenas were denied. The granting of a new trial for any other reason would not be justified. For example, it would not be proper to grant a new trial on the possibility that the requested witnesses would give testimony favorable to appellant in addition to that set out in the justification, or on the possibility that appellant might in the interim locate other witnesses favorable to his defense. Yet, if all three of the witnesses were produced and testified fully as represented, none of the testimony upon which appellant was convicted would be contradicted. The evidence of appellant's guilt of assault with intent to commit rape was overwhelming and uncontradicted—in fact, admitted by appellant in his conversation with the witness Tom Yates.

Under the circumstances no interest of justice will be furthered by ordering a new trial. The concept of equal and im-

partial justice will not be enhanced under the facts of this case by officially pretending that an innocent indigent defendant may have been convicted because of the failure of the State to provide necessary witnesses for his defense. Furthermore, if it is believed that Osterback is also guilty of some crime, the logical thing to do is to investigate further, but not to use his suspicion as a ground for ordering appellant's retrial.[10]

On the other hand, there is the distinct possibility that before the case can be retried, evidence essential to the state's case will be lost.

The majority emphasizes the fact that appellant was tried a long distance from his home and that his defense may have suffered because of cultural and linguistic barriers between he and his counsel. In my opinion these supposed disadvantages are more imaginary than real. Many experienced Alaska defense counsel will verify that it is quite as likely that appellant gained an advantage in having his actions judged by an Anchorage jury, as compared with a jury drawn from the area of his residence, because of the frequent tendency of a predominantly white-man's jury to be more sympathetic and lenient of actions committed in a frontier or primitive habitat by persons of a supposedly more primitive culture. Linguistic and cultural barriers between appellant and his counsel will not be eliminated or improved by another trial.

One effect of the granting of a new trial might very well be to shock the concept of justice of those of appellant's culture who are familiar enough with the evidence upon which appellant was convicted, who would be unable to understand or rationalize and would have little patience with what appears to be a rigid observance of form over substance.

I would affirm the judgment.