**UNITED STATES of America, Plaintiff-Appellee,**

v.

**William ALOISIO et al., Defendants-Appellants.**

**Nos. 17799–17802.**

United States Court of Appeals, Seventh Circuit.

March 10, 1971.

Rehearing Denied in No. 17802, April 9, 1971.

Frederick F. Cohn, Martin S. Gerber, Ronald P. Alwin, George F. Callaghan, Julius L. Echeles, Jo-Anne F. Wolfson, Chicago, Ill., for appellants.

William J. Bauer, U. S. Atty., Joseph K. Luby, Asst. U. S. Atty., Chicago, Ill., for appellee; John Peter Lulinski, Jeffrey Cole, Asst. U. S. Attys., of counsel.

Before SWYGERT, Chief Judge, HASTINGS, Senior Circuit Judge, and CUMMINGS, Circuit Judge.

CUMMINGS, Circuit Judge.

In July 1968 the four appellants and four others were indicted for conspiring to counterfeit United States Treasury Notes in the northern district of Illinois, commencing in September 1967, in violation of the general conspiracy provision found in 18 U.S.C. § 371. Bartoli was also charged in Count Two with forging 99 counterfeit United States Treasury Notes in Rockford, Illinois, in January 1968, in violation of 18 U.S.C. § 471. In Count Seven, he was charged with having a counterfeit $10,000 Treasury Note in his possession on January 20, 1968, in Chicago, intending to sell it, in violation of 18 U.S.C. § 474. Jasinski was also charged with having the same Treasury Note in his possession in Chicago on January 16, intending to sell it, in violation of the same provision. Aloisio, Jasinski, and Solomon were named in three other counts concerning actions with respect to the 99 counterfeit $10,000 Treasury Notes, allegedly violating 18 U.S.C. §§ 472, 473, and 474. After a jury trial, the four appellants were found guilty as charged. Solomon and Bartoli received 10-year concurrent sentences on the substantive counts and five-year concurrent sentences on the conspiracy count; Aloisio and Jasinski received 5-year concurrent sentences. Having considered the various grounds urged for reversal, we affirm.

## I. *The Validity of the Indictment.*

### A. Use of Hearsay Evidence.

Defendants first challenge the validity of the indictment against them on the ground that it was based "largely if not wholly" upon hearsay testimony.

In Costello v. United States, 350 U.S. 359, 76 S.Ct. 406, 100 L.Ed. 397, the Supreme Court categorically refused to invalidate an indictment based upon hearsay evidence under either the Fifth Amendment or its supervisory powers over federal courts. This Court has repeatedly rejected similar attacks upon the quality of evidence relied upon by grand juries. See, *e. g.*, United States v. Daddano, 432 F.2d 1119, 1125 (7th Cir. 1970), certiorari denied, 39 U.S.L.W. 3450; United States v. Braico, 422 F. 2d 543, 545 (7th Cir. 1970). Nor is there any suggestion in this case that

the "integrity of the judicial process" is jeopardized by the manner in which the Grand Jury reached its determination. See United States v. Leibowitz, 420 F.2d 39, 42 (2d Cir. 1969).

### B.  Failure to Preserve Testimony.

■ Defendants next ask that the indictment be dismissed because the Government failed to record and preserve the testimony of witnesses before the Grand Jury. They argue that such a requirement is necessary in order to implement the right of a defendant to access to a witness' grand jury testimony on subjects about which he subsequently testifies at trial. See United States v. Amabile, 395 F.2d 47, 53 (7th Cir. 1968), certiorari denied, 39 U.S.L.W. 3361.

The basic rules relating to federal grand juries are set forth in Rule 6 of the Federal Rules of Criminal Procedure. Rule 6(d) presently permits, but does not demand, the presence of a stenographer for the purpose of recording evidence. This approach, though justifiably criticized on several grounds, has nevertheless been uniformly observed by other Circuits. See Schlinsky v. United States, 379 F.2d 735, 740 (1st Cir. 1967); United States v. Cianchetti, 315 F.2d 584, 591 (2d Cir. 1963); United States v. Kind, 433 F.2d 339, 340 (4th Cir. 1970); Baker v. United States, 412 F.2d 1069, 1073 (5th Cir. 1969), certiorari denied, 396 U.S. 1018, 90 S.Ct. 583, 24 L.Ed.2d 509; United States v. Hensley, 374 F.2d 341, 352 (6th Cir. 1967); United States v. Franklin, 429 F.2d 274, 276 (8th Cir. 1970); United States v. Ybarra, 430 F.2d 1230, 1233 (9th Cir. 1970); McCaffrey v. United States, 372 F.2d 482, 484 (10th Cir. 1967), certiorari denied, 387 U.S. 945, 87 S.Ct. 2078, 18 L.Ed.2d 1332.[1] While we agree that the preservation of grand jury testimony is the wise practice, we are presently unwilling to bind the various district courts of this Circuit to such a practice. Rather, we will rely upon the individual district courts to exercise their local rule-making powers in this area pending any amendment to Rule 6(e) of the Federal Rules of Criminal Procedure.[2]

### II.  Sufficiency of the Evidence as to Aloisio and Jasinski.

#### A.  Aloisio

At the inception of the conspiracy in August 1967, defendant Grace Cosentino, whose trial was severed, told informer Ted Kay that she and her partners were planning to counterfeit United States government securities, and that she and her boy-friend "Smokes," later identified as Aloisio, were going to supply an unidentified banker friend with $1,500,000 worth of such securities. On January 11, 1968, she told Kay that she and "Smokes" were all set with such securities for their banker friend. Kay agreed to supply her with a purchaser for some of the counterfeit Treasury Notes. Mrs. Cosentino agreed to have "Smokes" or Solomon present at the time of delivery to protect the proposed deal. Five days later, she reiterated to Kay and Agent Gibbs that Solomon or "Smokes" would be present at the clos-

---

1.  The American Bar Association's Special Committee on Federal Rules of Procedure has, for the second time, recommended to the Supreme Court's Advisory Committee an amendment to Rule 6(e) of the Federal Rules of Criminal Procedure which would mandate recording of all testimony before an accusatorial grand jury. 52 F.R.D. ——, ——; see also 38 F.R.D. 95, 106.

2.  Commendably, the United States District Court for the Northern District of Illinois has already adopted an appropriate rule to that effect:

Local Rule 1.04(c). *Official Reporter to Attend Sessions of the Grand Jury.* An Official Reporter of this Court shall attend and record all testimony of witnesses appearing before every Grand Jury. Such record shall be filed with the Clerk of the Court and transcribed and released to the Court upon order or to the United States Attorney upon request and payment of the appropriate fees to the Official Reporter.

See United States v. Gramolini, 301 F. Supp. 39 (D.R.I.1969), for a perceptive study of this problem.

ing to protect all parties. Gibbs expressed some suspicion of "Smokes," but Mrs. Cosentino assured him that "Smokes" knew of the counterfeiting venture and could be trusted.

On the evening of January 17, Aloisio phoned Mrs. Cosentino's home from a restaurant and lounge at 1202 West Grand Avenue, Chicago. He told Mrs. Cosentino's daughter, Antonia, to call her mother and have her call him at HA 1–8760. Antonia relayed this message to her mother who was then in Agent Gibbs' room in the Chicago Airways Motel. Mrs. Cosentino told Gibbs that her close friend "Smokes" was concerned about her and had just asked her, through Antonia, to call him at HA 1–8760. Mrs. Cosentino tried that number and received a busy signal. Thereafter, Aloisio again telephoned Antonia and told her that he had not yet heard from Mrs. Cosentino. Antonia then called her mother again, and Mrs. Cosentino told Gibbs that "Smokes" had called again and was concerned about her.

Thereafter, Mrs. Cosentino called HA 1–8760 from Gibbs' room. He overheard her say that "she was with the man [Gibbs] at the motel room at that time, and was talking to him about the deal, and told this individual [Aloisio] that he had nothing to worry about; that I [Gibbs] was a gentleman, and she didn't see where anything could go wrong and told him not to worry." She also asked him where he was going to be later and told him that she would see him later that day. After she hung up, she told Gibbs "that was her friend Smokes who was very concerned about her." She stated that "he felt that the deal she was entering into with me [Gibbs] might be a setup, and that because he was such a close friend he was concerned about her welfare and didn't want her to get into any trouble." Over objection the foregoing testimony was admitted into evidence. It indicates that Aloisio was involved in the conspiracy as early as August 1967. Moreover, his telephone conversation with Mrs. Cosentino revealed his knowledge of the conspiracy and his concern for its success.

Through Antonia Cosentino and the telephone number testimony, the Government showed that Aloisio was the person to whom Mrs. Cosentino was talking from Gibbs' motel room. Accordingly, the testimony of Mrs. Cosentino's conversation with Aloisio was competent (United States v. Bucur, 194 F.2d 297, 304 (7th Cir. 1952) ) and evidenced a conspiracy in which Aloisio was involved. The remainder of Mrs. Cosentino's statement to Gibbs was also admissible against Aloisio as a statement of a co-conspirator in furtherance of the conspiracy. Aloisio's January 22 appearance with Jasinski outside the motel, surveying the motel for about 30 minutes with the car motor on, corroborated Mrs. Cosentino's and Solomon's statements to Gibbs that morning that they had partners across the street covering the deal. We conclude that there was ample evidence to link Aloisio with this conspiracy and to make him an aider and abettor as to the three substantive counts in which he was named.

B. Jasinski

On January 22, 1968, when Solomon and Mrs. Cosentino were delivering $1,000,000 in counterfeit Treasury Notes to Agent Gibbs in his motel room, they told Gibbs that two of their partners were across the street from the motel in an automobile for the protection of all concerned. At the same time, Agent Tucker had observed Jasinski and Aloisio watching the motel for about 30 minutes from their parked car with the motor on. Mrs. Cosentino's and Solomon's remarks to Gibbs clearly linked Jasinski and Aloisio to the scheme. Jasinski was also linked by his right thumbprint found on a "Saturday Evening Post" covering a sample of the counterfeit Treasury Notes that Mrs. Cosentino delivered to Gibbs on January 16. Since the conspiracy had already been established, this evidence, viewed in the light most favorable to the Government, sufficed to connect Jasinski with the con-

spiracy. The evidence also established his culpability as an aider and abettor of the commission of the substantive offenses with which he was charged.

### III. *The Constitutionality of the Identification of Aloisio.*

■ Ted Kay, an unindicted coconspirator, began to cooperate with the Government in this investigation in September 1967. He, Solomon, and Mrs. Cosentino were arrested in Agent Gibbs' room at the Chicago Airways Motel on the morning of January 22, 1968. The Government has advised us that informer Kay was taken to the United States Marshal's lockup along with the other defendants for his own protection. At 11:00 a. m. in the lockup, before being placed in a cell, Kay was with "some of the defendants" and John Varelli. In response to a question as to what Varelli said to Aloisio, Kay replied:

"Well, the best as I can recall, I remember him [Varelli] saying, 'Hi, Smokes.' And Smokes spoke back to him in Italian. I could understand a couple of the words, but I didn't recall the whole conversation. In Italian, he [Aloisio] said not to say anything."

Relying upon Massiah v. United States, 377 U.S. 201, 84 S.Ct. 1199, 12 L.Ed.2d 246, defendant Aloisio now asserts that Kay's identification of him as "Smokes" should not have been admitted because the conversation occurred in the federal lockup after his arrest without benefit of counsel.[3] We disagree.

The defendants did not show that the purpose of placing Kay in the cell in the Marshal's lockup was to obtain information for this case. Kay himself testified that the Secret Service did not tell him to overhear what might be said in the Marshal's office or in the lockup cells. He was placed in a cell by himself and had no idea how many people were in the adjoining cell except that Varelli was in it during part of the hour that

Kay remained in his cell. The transcript does not reveal that Kay heard any conversations from other cells. Kay's subterfuge of being a codefendant had already been pierced, for, while standing in the lockup hallway with other apprehended persons, Aloisio saw Solomon kick Kay in the groin and later admonished Varelli in Italian "not to say anything." Kay was not placed in the lockup to elicit admissions, nor was Varelli's knowledge of Aloisio as "Smokes" deliberately elicited. In these circumstances, the admission into evidence of the volunteered statement of a non-defendant clearly did not vitiate Aloisio's conviction. United States ex rel. Milani v. Pate, 425 F.2d 6 (7th Cir. 1970); United States ex rel. Baldwin v. Yeager, 428 F.2d 182, 184 (3d Cir. 1970); United States v. De Leo, 422 F.2d 487, 496 (1st Cir. 1970), certiorari denied, 397 U.S. 1037, 90 S.Ct. 1355, 25 L.Ed.2d 648; United States v. Mitchell, 417 F.2d 1246, 1249 (7th Cir. 1969); United States v. Fioravanti, 412 F.2d 407, 413 (3d Cir. 1969), certiorari denied; Panaccione v. United States, 396 U.S. 837, 90 S.Ct. 97, 24 L.Ed.2d 88; cf. Miller v. Carter, 434 F.2d 824, 825 (9th Cir. 1970).

### IV. *The Suppression of Fingerprints.*

Defendant Jasinski urges that the fingerprints obtained from him after his January 22, 1968, arrest were subject to Fourth Amendment protection because his arrest was without probable cause. This objection was not made at the trial but may be considered here under Rule 52(b) of the Federal Rules of Criminal Procedure.

■ Even though the complaint against Jasinski was dismissed before his indictment, this record shows that there was probable cause for his January 22nd arrest. On the morning of January 22, in Agent Gibbs' room at the Chicago Airway Motel, Solomon and Mrs. Cosentino told Gibbs that they had

---

**3.** This objection was not made at the trial but will be considered in view of its constitutional nature. Silber v. United

States, 370 U.S. 717, 82 S.Ct. 1287, 8 L.Ed.2d 798 (per curiam).

two "partners" across the street covering the action, and Gibbs shortly thereafter so advised Agent Cozza. In turn, he communicated by radio to Agent Tucker on the street. Tucker told Cozza that Jasinski and Aloisio had been in the parking lot for half an hour seated in a car with the motor running and observing the motel. Theirs was the only car in the parking lot with anyone inside. Because of the information communicated to Gibbs by Mrs. Cosentino and Solomon, and because of Aloisio's and Jasinski's suspicious behavior on the motel parking lot, Tucker had probable cause to arrest them that morning. Therefore Davis v. Mississippi, 394 U.S. 721, 89 S.Ct. 1394, 22 L.Ed.2d 676 and Bynum v. United States, 104 U.S.App. D.C. 368, 262 F.2d 465 (1958), do not require the suppression of the fingerprints.

## V. *Improper Reference to Photographs.*

Defendants Aloisio and Bartoli contend that they were denied a fair trial because references to their so-called "mug shots" informed the jury of their prior criminal records. We have carefully studied the three brief passages in the transcript concerning these photographs and note that the references were not elicited by the Government but occurred in cross-examination by defense counsel. Although the testimony revealed that the photographs were seen by Agents Sheriff and Tucker in the Chicago office of the Secret Service, they were merely described as bust photos with their names written on the reverse sides. The evidence did not disclose that these were "mug shots" or contained police numbers thereon, nor was there any mention of prior criminal activities of these two defendants. No reversible error resulted from the innocuous comments concerning the two photographs. United States v. Robinson, 406 F.2d 64, 66 (7th Cir. 1969); United States v. Schwartz, 398 F.2d 464, 470 (7th Cir. 1969).

## VI. *Examination of Agent Tucker.*

Aloisio urges that reversal is required because of the following question asked by an Assistant United States Attorney:

"By Mr. Weber:

Q. Agent Tucker, going back to January 17th at 9:00 p. m., in the vicinity of Grace Cosentino's house, what if any information did you have as to whether Mr. Aloisio was there on business or on pleasure?

Mr. Callaghan: Oh, objection.

\* \* \* \* \* \*

The Court: The objection is sustained.

Mr. Weber: I have no further questions."

Aloisio's defense was that he was merely a social friend of Mrs. Cosentino. However, the Government was entitled to question that defense by asking Agent Tucker whether he had information that Aloisio's visit was indeed for business purposes, and government counsel was careful to phrase his question in the alternative. In any event, Aloisio's argument must fail, since the objection was sustained and the jury was instructed that it was to consider only properly admitted evidence.

## VII. *Entrapment Instructions.*

Solomon contends that the trial judge should have given three proffered entrapment instructions. However, the evidence does not reveal that any government agent induced Solomon to commit this offense. In fact, on January 18, 1968, informer Kay offered Solomon an opportunity to avoid participation. The trial court was correct in ruling that there was no evidence of entrapment, so that entrapment instructions were inapposite.

## VIII. *Comment on Defendants' Failure to Testify.*

Solomon and Aloisio assert that Agent Gibbs commented on their failure to testify. During his cross-examination by defendant Solomon, Gibbs was

asked whether he was wearing his "mickey mouse" watch when he met Solomon on January 18, and Gibbs replied, "You will have to put on one of your clients to determine that conclusion." No objection was made to this answer. The exchange occurred during the Government's case, when it was not known whether or no Solomon would take the stand. We do not view the remark as a comment on Solomon's failure to testify.[4] Moreover, the jury was properly instructed that a defendant has the right not to testify and not to draw any inference against him because of a failure to do so.

#### IX. *Cross-Examination of Informer Kay.*

Aloisio asserts that the defendants' rights were denied by the limitation of the cross-examination of informer Kay in three particular instances.

First, the district judge sustained the Government's objection as to whether Kay was guilty of filing false income tax returns. The defense was permitted to show that there was a pending indictment against Kay with respect to filing a false income tax return, thus permitting defendant to attack his credibility. As we noted in United States v. Varelli, 407 F.2d 735, 751 (7th Cir. 1969), cross-examination on such matters is subject to a self-incrimination exception, so that the court's ruling was correct.

Because of Kay's Fifth Amendment rights, the district judge also properly sustained an objection as to whether Kay had transported a $100,000 bond in interstate commerce. Again counsel was permitted to demonstrate Kay's indictment for that offense as affecting his credibility.

In a belated attempt to show that the Government posted the informer's bond, Aloisio urges that Kay should have been permitted to say who put up his $50,000 bond. In light of the exten-sive examination of the witness on all other possible links with the prosecution, if still questioned, the district court's ruling that the question of the source of bond money was irrelevant was not an abuse of discretion. Moreover, Aloisio's own counsel's closing argument indicated that Kay's mother raised the money.

Our examination of the voluminous cross-examination of witness Kay convinces us that extremely broad latitude was allowed defense counsel. They were given great freedom in their efforts to show that Kay was a biased perjuror with obligations to the Government, and that his testimony had been "bought" by the Secret Service. His unsavory background was thoroughly explored by defense counsel. Kay denied that he was testifying in the present lawsuit in order to be freed of the income tax and stolen bond charges, and the jury was entitled to credit his denial. The strictures of *Varelli* and similar cases dealing with the scope of cross-examination were abundantly satisfied.

#### X. *The Prosecutor's Closing Argument.*

Aloisio and Bartoli assail the prosecutor's closing argument to the effect that (1) Kay's testimony was so well corroborated by Secret Service agents that the jury would have to disbelieve the prosecutor and agents if it disbelieved Kay, (2) it was not the Government's intention to send innocent men to the penitentiary, and (3) the Government was standing by its agents. These remarks are rather typical of the highflown rhetoric used in closing arguments by both sides. The prosecutor was not impermissibly speaking of facts outside the record or within his own personal knowledge. In the context of his closing, he was referring to what was in the record and rebutting the attack of the defense on the integrity of the prosecution, including "the manufacturing of crime." The comments of government counsel were quite clearly provoked by the vigorous defense and do

---

4. United States v. Blassick, 422 F.2d 652, 654 (7th Cir. 1970).

not merit reversal. Lawn v. United States, 355 U.S. 339, 359–360, 78 S.Ct. 311, 2 L.Ed.2d 321 note 15; United States v. Battiato, 204 F.2d 717, 719 (7th Cir. 1953).

The judgments are affirmed.