UNITED STATES of America, Plaintiff-Appellee,

v.

Henry W. COGWELL, Defendant-Appellant.

UNITED STATES of America, Plaintiff-Appellee,

v.

Charles Edward BEY et al., Defendants-Appellants.

Nos. 72–1671, 72–1672.

United States Court of Appeals, Seventh Circuit.

Argued Sept. 14, 1973.

Decided Oct. 30, 1973.

---

James D. Montgomery, David Lowell Slader, John Powers Crowley, Chicago, Ill., for defendants-appellants.

James R. Thompson, U. S. Atty., William T. Huyck, Gordon B. Nash, Jr., Asst. U. S. Attys., Chicago, Ill., for plaintiff-appellee.

Before CASTLE, Senior Circuit Judge, and PELL and SPRECHER, Circuit Judges.

CASTLE, Senior Circuit Judge.

Defendants Bey, Cogwell, Fort, Jackson and Pugh[1] appeal their jury convictions for conspiring to make false statements to the Office of Educational Opportunity, to obtain fraudulently monies which were the subject of a poverty program grant, and to defraud the United States through falsification and concealment of material facts. Defendant Jackson also appeals his convictions for knowingly making false statements in contravention of 18 U.S.C. § 1001 by signing the time and attendance sheets of program trainees with the knowledge that they were neither at the training centers nor at job interviews (9 counts), and for misapplying grant funds by endorsing the names of trainees to stipend checks knowing that they received neither the checks nor the proceeds and causing the fraudulent endorsement of the checks in violation of 42 U.S.C. §

2703 (2 counts). Defendant Bey additionally appeals his conviction for knowingly making false statements, contrary to 18 U.S.C. § 1001, by signing check receipts with the knowledge that the trainees did not receive the checks or the proceeds (6 counts). Defendant Cogwell further appeals his convictions for knowingly making false statements, unlawful under 18 U.S.C. § 1001, by signing the time and attendance sheets of trainees with the knowledge that they were neither at the training centers nor at job interviews (2 counts) and by signing check receipts knowing the trainees neither received the checks nor the proceeds (4 counts). Cogwell also appeals his conviction for misapplying grant funds by endorsing the names of trainees to stipend checks and causing the fraudulent endorsement of them in violation of 42 U.S.C. § 2703 (4 counts).

Defendants were participants in a program funded by an Office of Educational Opportunity[2] (hereinafter O.E. O.) grant given in June 1967 to the Woodlawn Organization (hereinafter T. W.O.), a Chicago community organization. The program was designed to utilize existing gang structure and leadership to provide basic educational and vocational skills to gang members. The grant provided that T.W.O. would establish four manpower training centers, with two of the centers established for the benefit of members of the Black P. Stone Nation gang. The grant specified that center chiefs, instructors, assistant instructors, and staff members would be drawn from the hierarchy of the gangs and would be salaried. To induce participation, the grant provided daily stipends and carfare allowances for trainees. The O.E.O. grant required T. W.O. to maintain detailed records and accounts of the payment of stipends to the individual trainees, and it specified that payment was to be conditioned on

---

1. The appeal of Cogwell, No. 72–1671, and the appeal of Bey, Fort, Jackson and Pugh, No. 72–1672, are consolidated for purposes of this opinion.

2. The Office of Educational Opportunity is an agency of the federal government operating pursuant to 42 U.S.C. §§ 2701–2994.

verification of the trainees' attendance at the centers. T.W.O. operationalized this rule by requiring the trainees to sign time and attendance sheets at the centers on arrival and departure at both sessions on each day. The center chief was responsible for collecting these sheets at the end of each week and for returning them to T.W.O. Stipend checks payable to the trainees and based on the time and attendance sheet data were forwarded to the centers for distribution by the chief and his staff to the trainees each Friday afternoon. Attached to each check was a receipt to be signed by the trainee-payee, collected by the staff, and returned to T.W.O.

When the grant was approved, Jeff Fort was the leader of the Black P. Stone Nation, a conglomerate of several Blackstone Ranger gangs, whose leaders formed the Main 21 (the ruling body) of the Black P. Stone Nation and, essentially, the supervisory and teaching personnel of the two centers. Jeff Fort was the Center 1 chief from the inception of the program until his incarceration on an unrelated matter on October 25, 1967,[3] when he ws succeeded by Fletcher Pugh, a Center 1 staff member. Henry Cogwell was Chief of Center 2. Charles Edward Bey was an assistant vocational educational supervisor at Center 2, where Robert Jackson was a community worker.

On this appeal, the defendants argue that the evidence is insufficient to support the jury verdict, that defendant Fort's right of confrontation was violated by the admission of inculpatory statements purportedly made by him to a codefendant who did not testify, and that the Chicago policemen's testimony based on observation of the program was the product of an unconstitutional search and was improperly admitted into evidence. For reasons set forth below, we affirm the convictions.

## I.

Defendants contend that the evidence was insufficient to sustain the jury's findings. With respect to the substantive counts, it was stipulated that Bey and Cogwell had written names other than their own to check receipts, that Jackson and Cogwell had written names other than their own to time and attendance sheets, and that Jackson and Cogwell had written endorsements to checks payable to trainees. The trial court instructed the jury, with the approval of counsel, that the determinative facts of legal liability in this case were, under 18 U.S.C. § 1001, whether the trainees in question received either their checks or the proceeds and, under 42 U.S.C. § 2703, whether the trainees involved were not present at the center or at job interviews. Defendants Bey, Cogwell and Jackson claim the government failed to prove its case because it did not present direct evidence from the trainees whose names were signed by Bey, Cogwell and Jackson that they received neither their checks nor the proceeds, or that they were not in class or at interviews. Defendants argue that the direct testimony of Duffy and Hall, named payees on a check and receipt in question, respectively, failed to add any material evidence beyond the stipulation and was therefore of no probative value. Defendants further claim that even if direct testimony is unnecessary to finding a course of unlawful conduct at Center 1, it would still be improper to infer the occurrence of unlawful activity at Center 2, where Bey, Cogwell and Jackson were staff members. With respect to the conspiracy count, the defendants contend that the failure to show a course of conduct to support the substantive charges is equivalent to a failure to prove concerted action necessary to find a conspiracy. Upon our examination of the evidence, we find that the jury, after weighing the evidence, determining the credibility of the witnesses, and drawing

3. Fort was released on March 25, 1968. It was stipulated that Fort did not assume a salaried position with the program on his release from jail.

reasonable inferences, had substantial support for its findings.

It is axiomatic in determining sufficiency of the evidence that an appellate court view the evidence and the reasonable inferences which can be drawn in the light most favorable to the government. Glasser v. United States, 315 U.S. 60, 80, 62 S.Ct. 457, 86 L.Ed. 680 (1942). This determination must be made considering all the evidence, including that of the defendants. United States v. Tubbs, 461 F.2d 43, 45 (7th Cir. 1972). However, this determination is not limited to a consideration of direct evidence, excluding circumstantial evidence of unlawful conduct at both centers. Circumstantial evidence is as pertinent as direct evidence to the establishment of guilt or innocence. Holland v. United States, 348 U.S. 121, 149, 75 S.Ct. 127, 99 L.Ed. 150 (1954). It is only required that circumstantial evidence be sufficiently relevant to have probative value. See, United States v. Delay, 440 F.2d 566, 568 (7th Cir. 1971); United States v. Lynch, 366 F.2d 829, 831 (7th Cir. 1966). This court has specifically stated: "Participation in a criminal conspiracy need not be proved by direct evidence . . . . [T]he conspiracy may be shown by circumstantial evidence or permissible inferences or deductions from the facts. Such a showing is nonetheless substantial." United States v. Zuideveld, 316 F.2d 873, 877–878 (7th Cir. 1963); Blumenthal v. United States, 332 U.S. 539, 549–550, 68 S.Ct. 248, 92 L.Ed. 154 (1947). Thus, it is unnecessary for the government to present testimony from the trainees named in the check endorsements and receipts and in the time and attendance sheets to sustain either the conspiracy or substantive counts, so long as the government presents sufficient, relevant circumstantial evidence to prove concert of action in the commission of unlawful acts, from which a common design can be inferred. United States v. Zuideveld, supra.

In demonstrating the operation of a sophisticated kickback scheme, the government concentrated on activities at Center 1, presenting testimony from instructors, assistant instructors, and trainees as well as police observers. Evidence of unlawful conduct in the signing of time and attendance sheets was overwhelming. Charles Hall, a trainee, identified four hundred forged signatures of his name in his time and attendance sheets for the period from March to May 1968. James Duffy, a trainee, identified almost five hundred unauthorized signatures in his sheets during the course of the program, while John Griffin identified ninety instances of forgery in his sheets. This practice occurred on a regular basis without authorization. Adam Battiste, a Center 1 instructor, identified over 1200 instances when he signed trainees' names to time and attendance sheets on the orders of Fort and others. On occasion, he would take entire sheets home and fill in the remaining blanks indiscriminately, whether or not the trainee had been present. Battiste also testified that Fort and others instructed him to maintain a separate "dock list" in which he recorded accurate attendance figures for the purpose of determining the weekly kickback amount per trainee. Griffin and Duffy testified that they signed other trainees' names to the sheets on orders from Pugh and Battiste. White, a Center 1 assistant instructor, witnessed instructors and trainees filling out time and attendance shees on at least twenty occasions.

The time and attendance sheets' indication of substantial growth in the number of trainees participating in the program was contrary to the direct evidence. White testified that although an average of fifty trainees were present during the beginning of the program, only fifteen or twenty remained by May 1968. Police Officer Houtsma testified that the names listed on the time and attendance sheets exceeded observed attendance on three occasions; he never saw more than twenty trainees at Center 1 in about 150 visits during the course of the program. Officer Doyle observed a range of three or

four to ten trainees in over 100 visits to Center 1 and a maximum of fifteen or eighteen trainees at Center 2. Officer Duffy saw a maximum of twenty trainees at each center. Trainee Duffy testified that Center 1 attendance ranged from three to twenty-five, while Turner, another trainee, observed ten to thirty trainees. Duffy, Hall, Griffin, Turner, and White all testified that instruction was both limited and sporadic at Center 1; this corresponded with the police observations.

The government also presented extensive evidence that trainees' names were signed to check receipts and endorsements in connection with the kickback operation. Near the commencement of the program, according to Duffy, Jeff Fort explained to Center 1 trainees that they were expected to return a portion of their stipends to Pugh and Battiste. Hall also testified to returning part of his payment to Pugh pursuant to instructions from Fort. As the program progressed, the gang refined its scheme by having staff members distribute the trainees' checks for endorsement, collect and cash checks, deduct the appropriate kickback, and return the net proceeds to the trainees. The gang then eliminated the formality of distributing the checks to trainees for endorsements prior to cashing the checks. Duffy testified that he signed other trainees' names on the backs of stipend checks at the request of Pugh and Battiste, and he observed Pugh, Jackson and others, in Fort's presence, writing trainees' names as endorsements to checks during March and April 1968. Duffy observed these checks being carried to a local store during this period and he saw Fort, Pugh, Jackson and other staff members return with substantial sums. White testified that Pugh kept the proceeds retained by the gang until Fort asked for the funds. The kickback scheme attained further refinement in Fort's announcement to all Black P. Stone Nation trainees at a mass meeting held at Center 2 on May 24, 1968, that while stipend checks for the final two weeks would be distributed for endorsement, anyone who claimed his check without demonstrable need would be subject to physical reprisals.

From our own review of the evidence, we concur with the trial judge's conclusion that "the permissible inference is that what happened at Ranger Center 1 happened at Ranger Center 2 . . . because there is sufficient evidence in the record . . . that they were coordinated operations.[4] The most striking example of the pervasive domination of the gang leadership at both centers occurred at the May 24 meeting. The meeting was held at Center 2, whose chief, Cogwell, was present. Yet it was chaired by Jeff Fort. Fort, the former Center 1 chief, was no longer a participant in the program following his release from jail. However, he was still the leader of the gang, and, as this meeting demonstrated, he controlled the terms under which gang members participated in the program. Pugh and Bey, Center 1 and 2 staff members, respectively, were also present. This pattern of interchangeable staff leadership between the two centers in pursuit of a common plan is abundantly evidenced by the record. Defendant Jackson, a Center 2 staff member, was particularly mobile. Battiste testified that Jackson and William Troope (an instructor from Center 2) would disrupt some of the few classes at Center 1 and would "slap around" trainees objecting to participation in the kickback scheme. Willie Harris testified that he saw Robert Jackson, in addition to eight other Center 2 staff members, on a day-to-day basis. White testified that Fort instructed Jackson and two other Center 2 leaders to keep students signed on the sheets whether or not they were still participating in the program. Duffy testified that Jackson and Lee Jackson (a Center 2 instructor) made cash payments to him as part of the kickback scheme and that he observed Jackson, Lee Jackson, and Syl-

4. Trial transcript 2421–2422.

vester Hutchins (a Center 2 instructor) signing trainee checks at Center 1. Hall testified that Lee Jackson was present during Center 1 training sessions and that Hutchins slapped him for objecting to the kickback requirement. Griffin observed Troope among a group of leaders who instructed him to sign other trainees' time and attendance sheets. Battiste testified that he saw Troope leave Center 1 with checks and return with cash.

There is substantial evidence that the activities occurring at Center 2 corresponded with those occurring at Center 1. T.W.O. officials, program participants, and Chicago policemen noted low attendance and sporadic instruction as common problems. The time and attendance sheets at Center 2 demonstrated the same disregard for reality evident in the Center 1 sheets. T.W.O.'s acting project director for the grant recalled observing less trainees than listed on the sheet on one day. He further testified that he closed down the center for a week, although the sheets indicated full attendance during this period. Trainee McDonald (Center 2) testified that he would sometimes be absent for a full week and still receive payments, as his name was signed to the sheets. During the final two-week period, he signed none of the twenty signatures on the sheets which purported to be his. Trainee McGill (Center 2) admitted that someone else had signed his name for the entire month of April 26–May 24, 1968. Willie Shaw, another Center 2 trainee, was paid for a week he spent in the county jail, when his name was signed to the sheets without his authorization. Talmidge McGraw, Center 2 trainee, could not identify any of the twenty signatures on his time and attendance sheet for the week ending May 24, 1968 as his own; he admitted that the signatures appeared to be written by the same hand. Further, he was uncertain whether any of the signatures on his time and attendance sheets for the period April 19–May 17, 1968 were his. Dennis Griffin (from Center 2) admitted that others signed his name to the sheets when he was not at the center. It was apparently a common practice as well to sign trainees' names to check endorsements and receipts. McGill stated he signed only one check during the month when others signed his name over one hundred times to the time and attendance sheets. It was stipulated that probably one individual endorsed groups of checks payable to trainees at both centers.

The circumstantial evidence suggesting that Jackson signed trainees' names to time and attendance sheets knowing they were neither present nor at job interviews is exceedingly substantial. Defendant stipulated to signing exclusively the nine trainees' time and attendance sheets in question; thus the remaining issue is whether he possessed the requisite knowledge. Although Jackson was on the Center 2 staff, the trainees involved were assigned variously to both centers. It would strain credulity for this court to believe that four times a day for an entire week, Jackson verified the whereabouts of nine persons, some of whom were not even assigned to his center. Moreover, the time and attendance sheets signed exclusively by Jackson cover the period reflected in the checks which were the subject of Jeff Fort's May 24th announcement. The jury could reasonably infer from the unlawful decision to retain the entire proceeds of trainees' checks that gang leaders in a position to determine the size of the checks, like Jackson, would falsify the time and attendance sheets by adding signatures in order to increase the amount the gang would receive. Such conduct by Jackson would conform to his pattern of participation in various aspects of the kickback scheme, as described above in testimony from Center 1 people.

The evidence is also more than sufficient for the jury to reasonably conclude that Jackson was guilty of the two check endorsement counts. Charles Hall, a Center 1 trainee, testified, regarding the March 22, 1968 check payable to him, that he did not cash the check, sign the

receipt or receive any of the proceeds. Jackson stipulated that he, in fact, had endorsed the Hall check. The jury could have reasonably inferred that Jackson knew Hall neither received the check nor the proceeds from Battiste's testimony that he had observed Jackson stealing stipend checks. Further, since Jackson stipulated that he endorsed the other check in question and since that check bore the same date as the Hall check, the jury could have justifiably inferred a pattern of unlawful conduct.

There is also sufficient evidence to support the conviction of Bey for signing check receipts knowing that the trainees did not receive the checks or the proceeds. Duffy, the named payee on one receipt, testified that he did not sign the receipt. Bey stipulated that he signed Duffy's receipt. Since Duffy further testified that he did not sign the endorsement for the check of the receipt in question and since Bey was a Center 2 supervisor, neither responsible for nor in the proximity of Duffy (a Center 1 trainee), the jury could reasonably have concluded that Bey knew Duffy would receive nothing. The jury could have properly inferred a pattern of illegal activity, as the probability would be remote that a Center 2 supervisor who stipulated to signing all six receipts would have insured the distribution of proceeds of six checks bearing identical dates to six trainees scattered at two centers. That improbability is substantiated by the evidence that at least one of the checks was endorsed by someone other than the named payee.

The evidence against Cogwell is also sufficiently substantial to support the determinations of the jury. First, there is much circumstantial evidence indicating that Cogwell was a participant in the kickback scheme. Rev. Arthur Brazier, President of T.W.O., testified that the trainees' checks were given by the T.W.O. staff to the center chiefs for distribution. The center chiefs were responsible for the return of the time and attendance sheets to T.W.O. Cogwell held the key position of Chief of Center 2.

It is unreasonable to assume that a kickback scheme involving Center 2 trainees in which Bey, Jackson and other Center 2 staff used inflated time and attendance sheets and forged check endorsements and receipts, could have operated successfully without the knowledge and participation of the center chief, Cogwell. In addition, the inference of coordinated, unlawful activity involving Cogwell is strengthened by two occurrences. On September 6, 1967, Officer Peck observed Fort, Cogwell, Bey and other members of the Main 21 standing on a neighborhood street corner at a time when instruction would normally be scheduled at the two centers. Of far greater significance, two witnesses, White and Harris, identified Cogwell as being among the center leaders present at the May 24, 1968 mass meeting at Center 2 when Fort announced that the proceeds of the last two paychecks would be retained.

With respect to the time and attendance sheet counts, Cogwell stipulated to signing the sheets of trainee Pitts and Reeves for an entire week, a total of forty signatures. During this period, Center 2 was reporting upwards of fifty trainees in attendance on the time and attendance sheets. However, Sam Sains, a program development adviser (who instructed one day per month at Center 2) and defense witness, testified that he never saw more than thirty-five trainees at Center 2. Police officers testified that they never observed more than twenty trainees at Center 2. Given this context, the jury could justifiably infer from Cogwell's prolonged pattern of exclusively signing the two trainees' names to their time and attendance sheets that he was acting in furtherance of the kickback scheme with knowledge that the trainees were not at the center.

Regarding the check receipt conviction, it is significant that all four check receipts bore May dates, a time when increasingly reckless and flagrant violations of the accounting system occurred. One check receipt was dated May 17, 1968, indicating that the check to which it was attached was distributed for en-

dorsement only at the May 24 mass meeting. In view of Fort's injunction to the assembled trainees in Cogwell's presence, the jury could reasonably conclude that Cogwell knew that the payee of that check received neither the check nor the proceeds. Cogwell stipulated to signing that check receipt as well as the other three receipts in question, and the jury could properly infer a pattern of signing trainees' names to check receipts with the knowledge that they would neither receive the check nor the proceeds.

The check endorsement counts involve two groups of checks issued near the termination of the program on April 19 and May 10, 1968. Cogwell stipulated to signing the check endorsement of five different trainees for those two days. Considering the totality of the evidence suggesting Cogwell's participation in an elaborate kickback scheme involving forged check endorsements, the jury could reasonably infer that Cogwell endorsed the checks with the knowledge that the trainees would neither receive the checks nor the proceeds. It is true that McDonald, McGill and McGraw testified that Cogwell picked up their checks at their request and remitted the proceeds to them. However, since these three trainees also denied the existence of the May 24 meeting, corroborated in detail by other witnesses, the jury could have quite properly discounted their testimony in concluding that Cogwell forged endorsements with the knowledge that the payees would not receive the proceeds.

■■ Finally, common purpose and plan may be inferred from a "development and collocation of circumstances," Glasser v. United States, *supra,* which demonstrates concert of action in the commission of unlawful acts. United States v. Zuideveld, *supra,* 316 F.2d at 878. In addition to the acts for which

Bey, Cogwell and Jackson were convicted, the record evidences other methodical violations of law occurring on a continuous basis at both centers pursuant to the kickback scheme. The testimony contains numerous references to Fort's pivotal position in both the gang and the scheme. It was he who announced the essential policy related to the operation of the scheme to trainees near the inception of the program and again on May 24, 1968. He ordered the maintenance of two separate books of attendance records, and he received the kickbacks collected by Pugh. Pugh was largely responsible for effectuating the scheme at Center 1. Witnesses testified that this included physically punishing recalcitrant trainees, endorsing and cashing trainees' checks, and collecting dock money. Therefore, based on our review of the record and applying the standards we have set forth, we hold that there is substantial evidence to support the jury's finding that defendants are guilty of the conspiracy charged.

## II.

■ During the trial, witnesses Turner and White testified, over objections, to hearsay admissions of defendant Pugh in which Pugh related his conversations with defendant Fort. On both occasions, the trial court instructed the jury that although the testimony was admissible against defendant Pugh, the jury should not consider it as evidence against defendant Fort. Notwithstanding these limiting instructions, Fort contends that since the testimony of inculpatory statements made by him to a codefendant who did not testify was heard by the jury, his right of confrontation was violated because of the substantial risk that the jury nonetheless considered the incriminating extrajudicial statements in determining his guilt.[5]

---

5. Fort asserts that his sixth amendment rights are violated unless the statements attributed to him are admissible against him. He then argues that the coconspiracy exception to the hearsay rule is not intended to encompass "double hearsay"—statements from one coconspirator which relate statements of another coconspirator. Defendant thus erroneously equates the confrontation clause of the sixth amendment and the evidentiary hearsay rules. Dutton v. Evans, 400 U.S. 74, 86, 91 S.Ct. 210, 27 L.Ed.

Turner stated that although he was formally a trainee in the program, he was performing the duties of an instructor and had requested a commensurate salary from Pugh. On the following day, Turner testified that Pugh told him in the presence of about twelve members of the Main 21 that "Jeff [Fort] had told him the night before that he [Fort] didn't want me [Turner] to quit, and [he would] split the dock money with me . . . ." White, an assistant instructor at Center 1, testified that after Fort's incarceration in the Cook County Jail, about thirteen members of the Main 21 including himself, went to visit Fort. Apparently, Pugh was the only one permitted to speak with Fort. White testified that following the conversation with Fort, Pugh told the Main 21 members at the county jail that "Fort told him [Pugh] to handle the money . . . [which] he was supposed to collect from both centers on Fridays [and] keep it . . . until Jeff Fort got out."

The defendant relies on Bruton v. United States, 391 U.S. 123, 88 S.Ct. 1620, 20 L.Ed.2d 476 (1968), a case involving a joint trial for armed postal robbery. A postal inspector testified that a codefendant, Evans, had confessed to him that Bruton and Evans had committed the robbery; Evans did not testify. The trial court instructed the jury to disregard Evan's confession in considering Bruton's culpability. The Supreme Court found this insufficient, holding that "in the context of a joint trial we cannot accept limiting instructions as an adequate substitute for petitioner's constitutional right of cross-examination." Id. at 137, 88 S.Ct. at 1628. The rationale of the decision was clearly expressed: "The risk of prejudice in petitioner's case was even more serious than in Douglas [Douglas v. Alabama, 380 U.S. 15, 85 S.Ct. 1074, 13 L.Ed.2d 934 (1957)] because . . . the powerfully incriminating extrajudicial statements of a codefendant, who stands accused side-by-side with the defendant, are deliberately spread before the jury in a joint trial." Id. at 127, 135–136, 88 S.Ct. at 1623, 1628. The evil which the sixth amendment was designed to prevent is illustrated in Douglas, where the prosecutor read a document purporting to be an accomplice's confession which incriminated the defendant. The Supreme Court noted that the accomplice's assertion of his right against compulsory self-incrimination "created a situation in which the jury might improperly infer both that the statement had been made and that it was true." 380 U.S. at 419, 85 S.Ct. at 1077. Since the prosecutor

2d 213 (1970). Justice White cogently answered this argument in California v. Green, 399 U.S. 149, 90 S.Ct. 1930, 26 L.Ed.2d 489 (1970):

While it may be readily conceded that hearsay rules and the Confrontation Clause are generally designed to protect similar values, it is quite a different thing to suggest that the overlap is complete and that the Confrontation Clause is nothing more or less than a codification of the rules of hearsay and their exceptions as they existed historically at common law. Our decisions have never established such a congruence; indeed we have more than once found a violation of confrontation values even though the statements in issue were admitted under an arguably recognized hearsay exception. The converse is equally true; merely because evidence is admitted in violation of a long-established hearsay rule does not lead to the automatic conclusion that confrontation rights have been denied. Id. at 155–156, 90

S.Ct. at 1933 [citations and footnote omitted].

Although the admissibility of the statements against Fort is not determinative of the sixth amendment issue he raises, it is well-settled that where a witness testifies that one coconspirator related the statement of a second coconspirator and both statements were made in the course of and in furtherance of the conspiracy, the evidence of the out-of-court statement by the second coconspirator (as well as that of the first coconspirator) is fully admissible against the second coconspirator and his fellow coconspirators. United States v. Aloisio, 440 F.2d 705, 708–709 (7th Cir. 1971), cert. den., 404 U.S. 824, 92 S.Ct. 49, 30 L.Ed.2d 51 (1972); United States v. Santos, 385 F.2d 43 (7th Cir. 1967), cert. den., 390 U.S. 954, 88 S.Ct. 1048, 19 L.Ed.2d 1148 (1968); see, Bruton v. United States, 391 U.S. 123, 128 n. 3, 88 S.Ct. 1620, 20 L.Ed.2d 476 (1968).

was not a witness, the inference that the accomplice made the statement could not be tested by cross-examination. Similarly, the accomplice could not be cross-examined on a statement imputed to him. *Id.*

 The right of cross-examination, however, is not absolute. There is no violation of sixth amendment rights where the testimony is sufficiently clothed with "indicia of reliability which have been widely viewed as determinative of whether a statement may be placed before the jury though there is no confrontation of the declarant." Dutton v. Evans, 400 U.S. 74, 89, 91 S.Ct. 210, 220, 27 L.Ed.2d 213. In *Dutton*, which also involved the coconspiracy exception to the hearsay rule, the Supreme Court upheld the trial court's admission of testimony by a fellow inmate of a codefendant who did not testify at the defendant's trial. The inmate related a statement of the codefendant from which the jury could infer the defendant's guilt. The Supreme Court found that the defendant was not deprived of any right of confrontation as to whether the codefendant actually made the statement to the witness, since the witness was cross-examined, and that the circumstances under which the statement was made indicated the content of the statement was true.

 Applying this two-fold test to the facts in this case, we find that the circumstances indicate that the challenged statements possess sufficient reliability to satisfy the demands of the sixth amendment. The statements in question did not involve the use of a confession made under the coercive circumstances of an official interrogation, as did *Bruton.* Although the statements were damaging, like the one in *Dutton,* they were in no sense crucial or devastating. *See,* Bruton v. United States, *supra.* There was no indication of prosecutorial misconduct or wholesale denial of cross-examination. *See,* Douglas v. Alabama, *supra*; Brookhart v. Janis, 384 U.S. 1, 86 S.Ct. 1245, 16 L.Ed.2d 314 (1966). At trial, the prosecution presented more than a dozen witnesses, all of whom were subject to cross-examination. Perhaps the most damaging evidence was the testimony of three eyewitnesses to the May 24, 1968 mass meeting. In view of the extent of the testimony inculpating Fort, these two statements, again like the one in *Dutton,* were "of peripheral significance at most." Dutton v. Evans, *supra,* 400 U.S. at 87, 91 S.Ct. 219.

Fort was not deprived of his right of confrontation on the issue of whether Pugh, a coconspirator, actually made the statements to Turner and White. The confrontation issues arise because the jury was asked to infer from the statements that Fort was a coconspirator and that Fort actually made the statements to Pugh. We conclude that there was no denial of the right of confrontation with respect to the latter issue. The possibility that Pugh's statements were based on faulty recollection is highly remote; on one occasion Pugh had spoken with Fort only moments earlier, and on the other he had talked with Fort during the previous evening. The circumstances under which Pugh made his statements also indicate that Pugh did not misrepresent Fort. The statements were made not only before the testifying witness but also in the presence of about twelve members of the Main 21 on both occasions. The leaders could have verified Pugh's statements with Fort. As some of the leaders had used physical force to insure the success of the kickback scheme, the penalty for perjury pales by comparison with the consequences Pugh would have doubtlessly suffered for lying. Pugh's statements were against his penal interests, and he had no obvious reason to lie to Turner or White.

There are also sufficient indicators of reliability to conclude that the statements which were made were true. Unlike *Bruton, Dutton,* and *Douglas,* the statements in question were made by Fort to a trusted coconspirator in the course of and in furtherance of the kickback scheme. Fort's statement authorizing Turner to share with him and others

in the kickback proceeds which Fort received was against Fort's penal and pecuniary interests. Fort's statement to Pugh at the jail to collect the funds and hold them for Fort until his release conformed with his *modus operandi* established by White's testimony. Fort's statement was in furtherance of his pecuniary interest in retaining control over the funds despite his incarceration and was against his penal interest. He had no apparent reason to lie to Pugh on either occasion.

### III.

At trial, seven Chicago policemen testified that in the course of several hundred visits to the centers from September 1967 to June 1968, they observed only limited trainee attendance and practically no instruction. Their testimony was at variance with the time and attendance sheets and circumstantially suggested the falsification of the sheets and the misapplication of grant funds. Defendants contend that these visits were searches in violation of their fourth amendment rights and that testimony of observations at the centers should have been excluded. McGinnis v. United States, 227 F.2d 598 (1st Cir. 1955); *cf.*, Wong Sun v. United States, 371 U.S. 471, 485, 83 S.Ct. 407, 9 L.Ed.2d 441 (1968). Defendants assert that the fourth amendment standard of an unreasonable search is tested by the individual's reasonable expectation of privacy. Katz v. United States, 389 U.S. 347, 88 S.Ct. 507, 19 L.Ed.2d 576 (1967). Specifically, they argue that in assessing whether the defendants' expectations are constitutionally justifiable, this court should focus on whether specially recruited youths could reasonably assert an expectation of privacy in their activities and should disregard the occurrence of those activities within the context of a federally-funded educational program. However, "the specific content and incidents of [fourth amendment rights are] shaped by the context in which they are asserted," Terry v. Ohio, 392 U.S. 1, 9, 88 S.Ct. 1868, 1873, 20 L.Ed. 889 (1968), and we must therefore consider all the relevant circumstances in determining the reasonableness of a search. From our examination of the facts, we find that the defendants had no reasonable expectation of privacy.

*Katz* establishes that "what a person knowingly exposes to the public, even in his home or office, is not the subject of Fourth Amendment protection." Katz v. United States, *supra*, 389 U.S. at 351, 88 S.Ct. at 511. Defendants were voluntary participants in an educational program subject to continual monitoring by United States government officials as well as T.W.O. officers. They cannot, therefore, reasonably claim the same expectancy of privacy which might shroud their purely personal activity. Further, the locations do not suggest an expectation of privacy. The training centers were generally accessible to anyone having an interest in the program, including some nonparticipants. The centers were not subject to the legal control of any of the defendants, and training centers are not intrinsically so closely associated with the individual as to give rise to a reasonable expectation of privacy. *Cf.*, Piazzola v. Watkins, 442 F.2d 284 (5th Cir. 1971); Wheeler v. Goodman, 330 F.Supp. 1356 (D.D.C. 1971). The nature of the activity belies an expectation of privacy. Educational classes are inherently group activities open to the full view of fellow participants, instructors, and administrative and supervisory personnel. The manner of the police presence also negates an expectation of privacy among knowledgeable gang members. The participants were fully aware of their observation by uniformed policemen. *Cf.*, Katz v. United States, *supra*. If the defendants had no reasonable expectation of privacy regarding activity at the training centers, the police observations of the activity are admissible. *See*, United States v. Horton, 328 F.2d 132 (3rd Cir. 1964), cert. den., 377 U.S. 970, 84 S.Ct. 1651, 12 L.Ed.2d 739 (1964).

There is a second reason why the police visits do not descend to

the level of unreasonableness proscribed by the fourth amendment. Investigation necessary to ensure proper effectuation of a tax-supported program is regarded as so essential to the fulfillment of a public trust that it is deemed reasonable. Wyman v. James, 400 U.S. 309, 91 S.Ct 381, 27 L.Ed.2d 408 (1971). The O.E.O. grant to T.W.O. envisioned civic involvment in the supervision of the program,[6] in accordance with the statutory mandate of O.E.O.[7] Both T.W.O. and O.E.O. invited the Chicago Police Department to attend weekly monitoring meetings of the program in order "to give the police department access to the program so they could understand the contents, and if they had any questions, they could raise them at that time."[8] It is doubtful that the police would have sufficient information to formulate questions or to participate effectively in the weekly evaluation sessions unless it was contemplated by O.E.O. and T.W.O. that the police would observe the operation of the program. This is supported by the testimony of T.W.O.'s president and executive director (both of whom participated in the weekly meetings with the police) that despite the hundreds of police visits to the centers, they had no recollection of requesting the police to cease the visits. O.E.O. involved the police in other aspects of its evaluation of the program. O.E.O.'s chief investigator at the time testified that he encouraged police cooperation and that his visits to the centers with the police resulted in changes in the conditions of the grant. While the exact role of the police in the program is unclear, the police apparently

functioned as an investigatory adjunct to O.E.O.'s evaluation system, *see,* Wyman v. James, *supra* at 323, 91 S.Ct. 381, aiding the agency in "assuring that the intended and proper objects of the tax-produced assistance [here the trainees] are the one[s] who benefit from the aid it dispenses." *Id.* at 319, 91 S.Ct. at 386. The Supreme Court's conclusion is equally apt: "Surely it is not unreasonable, in the Fourth Amendment sense, or in any other sense of that term, that the State have at its command a gentle means, of limited extent and of practical and considerate application of achieving that assurance." *Id.* As in Wyman, there was no snooping, no visitation outside of working hours, and no entry under false pretenses. *Id.* at 321, 91 S.Ct. 381. During the hundreds of visits, there was only one forcible entry, when Officer Houtsma sought a suspect in an office, and that event was completely extraneous to the trial testimony. Generally, the visits lasted thirty minutes and occurred between three and five times per week, though on occasion both frequency and duration increased markedly. During the visits, the police observed the activity in the classrooms. While there is conflicting evidence on the effect of the police visits on the educational program, we accept the logic of the trial judge: if interference was a serious problem, it is inconceivable that *nobody* ever told the police that their visits three to five times a week were interfering with the operation of the school and that they were to please stay out. Mere observation by policemen is inherently less disrup-

6. For example, the Mayor of Chicago apparently had veto power over the appointment of the program's director.

7. Title 42 U.S.C. Section 2974 provides:
 In addition to his other powers under this chapter, and to assist the President in coordinating the antipoverty efforts of all Federal agencies, the Director shall—
 \* \* \* \* \*
 (2) carry on a continuing evaluation of all activities under this chapter and consult with interested agencies and groups, including *State agencies* described in section

2824 of this title and the National Advisory Council, with a view to identifying coordination problems that may warrant consideration by the Council or the President and to the extent feasible or appropriate *initiate action for overcoming those problems,* either through the Office of Economic Opportunity or in conjunction *with other Federal, State, or local* agencies (emphasis added).

8. Testimony of Leon Finney, Trial Transcript 731.

tive to the beneficiaries of a public program than an interrogational visit focusing on personal relationships, beliefs and behavior. *See*, Wyman v. James, *Id.* We conclude that the police conduct conformed to the limits set forth in *Wyman* and therefore did not constitute an unreasonable search.

▉▉▉▉ Finally, a search to which voluntary consent is given is not an unlawful search, and evidence obtained through the search is admissible. *See*, Bumper v. North Carolina, 391 U.S. 543, 88 S.Ct. 1788, 20 L.Ed.2d 797 (1968). While consent to a search is not lightly inferred and depends on the facts of each case, United States v. Durham, 475 F.2d 208 (7th Cir. 1973) (Pell, J., concurring), the circumstances here indicate that T.W.O., the grant recipient and lessee of the centers, impliedly consented to the several hundred police visits which occurred during the eight-month period. The President of T.W.O., Rev. Arthur Brazier, and T.W.O.'s executive director, Leon Finney, were experienced community organizers sufficiently sophisticated at dealing with government officials to obtain a grant of almost one million dollars. They met weekly with high-ranking police officers at the monitoring meetings. Despite their frequent opportunities to object to the visits, Brazier testified that his only response was to complain at some of the meetings that policemen "ought to be more responsible." Similarly, Finney complained of police harassment of gangs in general. Significantly, both complaints were directed to police conduct rather than to police presence. The decision to consent tacitly was based neither on intimidation nor ignorance but on T.W.O.'s inability to protest successfully past police practices. Nothing in the record indicates that T.W.O. was acquiescing to a police claim of lawful authority, *cf.* Amos, v. United States, 255 U.S. 313, 317, 41 S.Ct. 266, 65 L.Ed. 654 (1921); Bumper v. North Carolina, *supra*, 391 U.S. at 549, 88 S.Ct. 1788 for there is no evidence of any police claim. Since T.W.O. was the administrator of the program in which defendants participated and the lessee of the premises to which defendants were invited, and since the defendants had no reasonable expectation of privacy from T.W.O. with respect to classroom activity, we find that T.W.O.'s implied consent validated the police observation of the program activity.

Affirmed.